**George Robert BOYKINS et al., Appellants,**

v.

**FAIRFIELD, ALABAMA BOARD OF EDUCATION et al., Appellees.**

**No. 25114.**

United States Court of Appeals Fifth Circuit.

July 30, 1968.

Jack Greenberg, New York City, Macon L. Weaver, U. S. Atty., Birmingham, Ala., Norman C. Amaker, New York City, Demetrius C. Newton, Orzell Billingsley, Jr., Birmingham, Ala., for appellants.

Maurice Bishop, Birmingham, Ala., for appellees.

Before JOHN R. BROWN, Chief Judge, WISDOM, Circuit Judge, and BREWSTER, District Judge.

WISDOM, Circuit Judge.

This case was one of several consolidated with United States v. Jefferson County Bd. of Education, 5 Cir. 1966, 372 F.2d 836, aff'd en banc, 380 F.2d 385, cert. denied sub nom., Caddo Parish School Bd. v. United States, 1967, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103. On remand the district court entered the *Jefferson* decree. At the conclusion of the choice period, May 1 through June 1, the School Board submitted a report to the district court showing that of a total enrollment of 3850 students, 3245 had executed choice forms. The Board denied 53 applications for transfer, all from Negro students who sought to attend

formerly all-white schools. Twenty-eight were denied on the basis of poor grades, four for late filing, one for failure to sign the choice form, six for disciplinary reasons, and fourteen for non-residency. The plaintiffs filed objections to this report. After a hearing, the district court gave the non-signer an opportunity to file a new form, and ordered the Board to grant the applications which had been denied for poor grades and late filing.[1] The court upheld the action of the Superintendent in denying the choice applications for non-residency and disciplinary reasons.

Paragraph II(1) of the *Jefferson* decree, 380 F.2d at 392, reads as follows:

*Preference in Assignment.* In assigning students to schools, no preferences shall be given to any student for prior attendance at a school and, except with the approval of court in extraordinary circumstances, no choice shall be denied for any reason other than overcrowding.

The parties do not suggest that there is any problem of overcrowding in any Fairfield school. Thus the issue in this case essentially shakes down to whether the reasons advanced by the Board for denying these choices are "extraordinary circumstances" within the meaning of that term as used in *Jefferson.*

We hold that the non-residents admitted to the system were entitled to exercise a choice of schools in the same manner as other students. We remand the disciplinary cases to the district court for further consideration.

## I.

### The "Non-Residents" [2]

For many years, students living in two small areas of the City of Birmingham bordering on Fairfield (Englewood and Vinesville) have been permitted to attend schools in Fairfield. This arrangement came about through an agreement between the school boards of the two cities. Its purpose, according to the Fairfield superintendent, was to reduce the travel distance for students who lived closer to Fairfield schools than to the Birmingham schools which they would otherwise attend.

During the 1967 choice period, 191 students in Birmingham, 93 white and 98 Negro, elected to attend various Fairfield schools. Of these applications, all those of the whites and 84 of the Negroes were approved and accepted. Each of these children had applied to attend schools previously designated for his race. Fourteen Negroes sought to attend previously all white schools; the Board denied all of their applications. In most cases, the letters sent by the superintendent to explain these rejections simply noted that the applicants did not live in Fairfield. In at least one instance, however, the letter noted that if new applications were submitted for the Negro school, the matter would be reconsidered.

1. The district court also ordered that the seventh and eighth grades at the Englewood School, an all-Negro school and the last remaining Fairfield school with eight grades, be terminated. The eight students enrolled in those grades at Englewood were permitted to choose another school. The Board has complied with all rulings against it.

2. The defendants argue that these plaintiffs lack standing to complain about the treatment of the non-resident students. They point out that this class action was brought by and on behalf of adult Negroes and "their minor children residing in Fairfield." No cases are cited relevant to this fact situation, and we have found none. The record before us contains no motion objecting to the plaintiffs' standing. The district court ruled on the merits. The plaintiffs would come within the class, if the class were regarded as children residing in Fairfield for purposes of school attendance. The object of the basic action is the desegregation of the Fairfield schools; the class in reality is the Negro students attending those schools. The denial of the transfer applications of the fourteen Negro students who sought to attend predominantly white schools directly affects the object of the suit and the plaintiffs as a class.

These fourteen Negroes contend that the school officials denied their applications for the purpose of maintaining segregation. The school officials counter that the purpose of the agreement with Birmingham was merely to save travel distance for these students, and that if the fourteen were permitted to attend the schools they had selected, they would have to travel a longer distance than if they went to the nearest Birmingham school.

The opinion below stated: "The Court is not aware of any law that requires the Fairfield School System to accept non-resident students, and the evidence does not reveal that these non-residents were rejected because of their race." In the abstract, it is certainly true that a school system does not have to provide education to children living outside of its jurisdiction. However, Fairfield has been providing schooling to these children, or others in like circumstance, for some years. It is only now when they seek to attend different schools within the Fairfield system that the matter of their residency has become an issue. No claim is made that their attendance at different schools would place any burden on these schools, through overcrowding, added expense, or otherwise. If anything, the burden is on the students, who would have to travel longer distances to school, and they seem willing to assume that burden.

On these facts, the case is controlled by our decision in Bossier Parish School Bd. v. Lemon, 5 Cir. 1967, 370 F.2d 847. *Lemon* was an action to desegregate the Parish school system brought on behalf of Negro children of servicemen stationed at the Barksdale Air Force Base, located in Bossier Parish. By virtue of an agreement between the Federal Government and the Parish, these children attended public schools operated by the School Board. The school system was then completely segregated. The school board objected to the suit on the ground that the "federal" children were permitted to attend the parish schools by sufferance, and therefore were in no position to complain about their treatment. The district court summarily rejected this argument, and we affirmed, stating:

Even if the school board were under no obligation to provide public education to children of military personnel on the air base, it could not provide that education subject to an unconstitutional condition. [Citing cases]. The plaintiffs here had been admitted to the school system, but had been denied the opportunity to transfer from a Negro to a white school. Once the plaintiffs had been admitted to the school system, they had a constitutional right to a desegregated education, and have standing to enforce that right—free of any unconstitutional condition precedent.

370 F.2d at 851.

■ Once accepted in the Fairfield school system, these "non-residents" have the same right to desegregated education as any other student in the system. On this record, we are unable to say with certainty whether all of the fourteen are in fact within this special category, although it is clear that some of them are, and in any event it is too late to correct their assignments for this school year. In the future, the standard should be that a student who is admitted to the school system and attends a particular Fairfield school shall be entitled to choose *any* Fairfield school in the same manner as any other student within the system, assuming, of course, the continued existence of the freedom-of-choice plan under the *Jefferson* decree.[3]

---

**3.** We rely on the good faith of the school board in assuming that this ruling will not lead to the abrogation of the agreement regarding these students, at least insofar as such abrogation would work to the detriment of students now in the Fairfield system who would suffer if involuntarily forced to transfer into a new school system.

## II.

### The Disciplinary Cases

The superintendent of the Fairfield schools testified that it is the uniform policy of the administration to deny transfers to a student who is a disciplinary problem, and that this policy is applied uniformly, without regard to the race of the student. The basis of this policy is that such students are more likely to reform in a familiar environment, where they are well known to the teachers and administrators, than in a hostile environment. The plaintiffs contend that the policy was applied here with the purpose of requiring the Negro children to "pass muster" before they could be permitted to associate with whites.

*Brown, Jefferson,* and other school segregation decisions were not intended to prevent the exercise of sound discretionary judgment by school administrators, so long as such judgment was not exercised for the purpose of maintaining or promoting segregation. We assume the good faith of the superintendent and credit his testimony that the rule here was applied without regard to race and for the purpose of sound educational and social development of the child. We hold therefore that disciplinary reasons may well be "extraordinary circumstances" within the meaning of the *Jefferson* decree.

The situation creates a danger that the exception may engulf the rule. We hold therefore that the burden lies on the school administrators to justify, in each case, that the disciplinary problem involved is so great that the student should not be permitted the usual freedom of choice. In this case, the record suggests only vaguely the nature of the misbehavior. The records of each of the six children were brought to court by the superintendent, but were not put into evidence so that they would not become a matter of public record.[4] The defendant proffered the records to the plaintiffs' attorneys who declined to examine them.[5] For the future, the school board may continue to apply, uniformly and without regard to race, a standard which denies a change of school to students who are disciplinary problems, but the burden is on the board to show, in each instance, that the case is in fact one of such extraordinary circumstances as to justify departure from the freedom-of-choice plan.

\* \* \* \* \* \*

As to the "non-residents" the order appealed from is reversed. As to the disciplinary cases, it is vacated, and the cause is remanded for further proceedings consistent with this opinion.

---

4. Of course this same objective might be achieved through *in camera* examination of the files sealed in the record.

5. As we said recently in another school case, "we suggest that the [plaintiff-] appellants \* \* \* concentrate their efforts in working out the method of obtaining substantial compliance administratively with the appellee boards" rather than pursuing adversary litigation. Jones v. Caddo Parish School Bd., 5 Cir., 1968, 392 F.2d 721, 723.