George Robert **BOYKINS** et al.,
Plaintiffs-Appellants,

United States of America, etc.,
Plaintiff-Intervenor,

v.

**FAIRFIELD BOARD OF EDUCATION**
et al., Defendants-Appellees.

No. 71-3028.

United States Court of Appeals,
Fifth Circuit.

Feb. 23, 1972.

Rehearing and Rehearing En Banc
Denied April 7, 1972.

Demetrius C. Newton, Birmingham, Ala., Norman C. Amaker, Sylvia Drew, Norman Chachkin, New York City, for plaintiffs-appellants.

Maurice Bishop, Birmingham, Ala., for defendants-appellees.

Before WISDOM, COLEMAN, and SIMPSON, Circuit Judges.

WISDOM, Circuit Judge:

Once again we are faced with the school desegregation problems of the City of Fairfield, Alabama.[1] On June 28, 1971, this Court remanded an appeal in this case to the district court for reconsideration in light of the Supreme Court decision in Swann v. Charlotte-Mecklenburg Bd. of Education, 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554:

> We think that the district court, because of its familiarity with local conditions, should have the first opportunity to determine whether the school desegregation plan the court approved for the Board of Education of the City of Fairfield, Alabama, complies with the principles established in the *Swann* decision.
>
> We remand this cause therefore to the district court for it to determine *forthwith* the acceptability of the school board's student assignment plan. In making this determination

---

1. This case was one of several consolidated with United States v. Jefferson County Bd. of Education, 5 Cir. 1966, 372 F.2d 836, aff'd en banc, 380 F.2d 385, cert. denied sub nom., Caddo Parish School Bd. v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967). See also Boykins v. Fairfield, Ala. Bd. of Education, 5 Cir. 1968, 399 F.2d 11; Boykins v. Fairfield Bd. of Education, 5 Cir. 1970, 421 F.2d 1330; Boykins v. Fairfield Bd. of Education, 5 Cir. 1970, 429 F.2d 1234. The opinions in these cases describe the school system and outline the course of school desegregation in the system.

the court should consider the feasibility and advantages of clustering schools or non-contiguous zoning. The district court should also consider whether the school board is in compliance with the *Singleton* requirements for faculty ratios and whether the location of a high school complex in a black neighborhood will tend to promote segregation as alleged by plaintiffs-appellants.

Boykins v. Bd. of Education of City of Fairfield, 5 Cir. 1971, 446 F.2d 973.

On August 31, 1971, the district court held a hearing to consider this Court's mandate and two motions filed by the plaintiffs. The subject of the plaintiffs' first motion, an attempt to enjoin the proposed transfer by the school board of a formerly all-black junior high school to the Jefferson County School System for use as a trade school, was mooted when the school board abandoned the plan. The plaintiffs' second motion sought to enjoin the school board from allegedly operating segregated classes at Fairfield High School and from continuing to operate Robinson Elementary School as an all-black facility. On September 16, 1971, the district court entered an order, accompanied by a detailed opinion, denying the plaintiffs' motions and concluding that "under all the circumstances the School System is in compliance with Swann v. Charlotte-Mecklenburg Board of Education."

## I. *Elementary Schools*

The appellants contend that the continued operation of Robinson Elementary School as an all-black facility violates the mandate of the Supreme Court, repeatedly reaffirmed by this Court, that racial discrimination in public schools be "eliminated root and branch". Green v. County School Bd. of New Kent County,

Va., 1968, 391 U.S. 430, 438, 88 S.Ct. 1689, 20 L.Ed.2d 716, 723.

The Fairfield school district covers approximately three square miles. There are 1193 white students and 1760 black students in the system; 363 whites and 641 blacks attend high school, and 830 whites and 1119 blacks attend elementary school. Under the school desegregation plan currently in effect, the school system has four elementary schools, and the city is divided into four zones which feed the schools. Glen Oaks is at the Western end of the city; Forest Hills is east of Glen Oaks and west of Wiebel Drive, a main street dividing the city; Robinson is east of Wiebel Drive and east of Forest Hills; and Donald is at the eastern end of the city. The district court, in its order, found that the enrollments of the elementary schools at the end of the 1970-1971 school year were as follows:[2]

|              | White | Black |
|--------------|------:|------:|
| Glen Oaks    | 359   | 48    |
| Forest Hills | 284   | 97    |
| Robinson     | 0     | 776   |
| Donald       | 189   | 198   |

As is apparent, almost 70 percent of the black elementary school children in the system attend Robinson Elementary school where no white children are in attendance.[3]

We hold that the continued maintenance of Robinson as an all-black school violates the school district's responsibility to "terminate dual school systems at once and to operate now and hereafter only unitary schools". Alexander v. Holmes County, 1969, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19. *See* Swann v. Charlotte-Mecklenburg Bd. of Education, 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554; Griffin v. County

2. The appellees' brief states the enrollments as of September 1971 were as follows:

|              | White | Black |
|--------------|------:|------:|
| Glen Oaks    | 370   | 48    |
| Forest Hills | 291   | 121   |
| Robinson     | 0     | 695   |
| Donald       | 193   | 200   |

3. An earlier order of the district court projected an enrollment for Robinson which included 57 white children. Testimony at the August 30 hearing revealed that these children had left the school system.

School Bd., 1964, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256; Green v. County School Bd., 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716.

Prior to this Court's remand for reconsideration in light of *Swann*, the Department of Health, Education, and Welfare had suggested that Robinson be paired with Forest Hills to achieve a greater degree of integration. The district court rejected this suggestion. When, after remand, the plaintiffs sought pairing of Robinson with Forest Hills or Glen Oaks or both, the district court again rejected the idea, stating:

> The Court is of the clear and certain conviction that to pair Robinson with Forest Hills or Glen Oaks, or both of these schools, would be a very dangerous undertaking. This Court is not willing to hazard the lives of the children who would be involved merely to achieve integration at Robinson.

The district court rejected pairing because Robinson is separated from Forest Hills and Glen Oaks by Wiebel Drive, a heavily traveled four-lane highway bisecting the city.[4] Wiebel Drive, however, cannot stop school desegregation in Fairfield. See Davis v. Bd. of School Commrs., 1971, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577; Pate v. Dade County, 5 Cir. 1970, 434 F.2d 1151. Both black and white students have, in past years and under the present plan, crossed Wiebel Drive to attend school. Whites cross Wiebel Drive to attend Forest Hill, and blacks currently cross the Drive to attend Forest Hill and Glen Oaks under the majority to minority transfer plan. There are safety measures that may be taken to overcome the hazards of crossing Wiebel Drive. For instance, the city could install traffic lights, build a pedestrian overpass (as it has previously done), or station crossing guards or policemen on Wiebel Drive.[5] Because the distance from Robinson to Forest Hill is only 1.1 miles, bussing may be an appropriate and relatively inexpensive method for transporting students to and from school; the system does in fact use a school bus. In many

4. Wiebel Drive is a four-lane highway that bisects the City and connects with Valley Road and Interstate I–59 on the north and with the Birmingham-Bessemer highway, U. S. 11, on the south. It is a little less than a mile long and there are no intervening intersecting streets or passage ways. All truck traffic proceeding northeast on U. S. 11 is directed over Wiebel Drive onto Interstate I–59 and thence to I–65, and all truck traffic moving in the opposite direction is likewise directed over Wiebel Drive to U. S. 11. This truck traffic will eventually move along I–59. However, I–59 comes to a dead end about one-half mile west of its intersection with Wiebel Drive and it will be two or three years before it can be completed. On the northwest corner of Wiebel Drive and U. S. 11 there is a forty-acre shopping center known as the Western Hills Mall. Just across Wiebel Drive on the southwest corner is another large shopping center. The Midfield shopping center is directly south of the intersection of Wiebel Drive with U. S. 11. Eighty-seven acres along the east side of Wiebel Drive and north of and adjacent to the Western Hills Mall is now being developed for another extensive shopping center. Lying along the north side of I–59 and Valley Road

are the plants of the United States Steel Corporation. These, together with the Ensley Steel Works directly to the east, extend for several miles along the north side of these highways. Many thousands of workers are employed in these plants and many of them live south of U. S. 11 and use Wiebel Drive in going to and from work; and as described in a previous hearing, the traffic on Wiebel Drive at the time children would be going to and from school is "bumper to bumper." Since there are no intersecting streets on Wiebel Drive there are no traffic lights, except in the area of its intersection with U. S. 11 on the South and I–59 and Valley Road on the north. The traffic on Wiebel Drive has increased more than 100 percent during the past year. From August 1, 1970, to August 29, 1971, there were 147 accidents on Wiebel Drive and a number of these were caused by drivers attempting to avoid children trying to cross Wiebel Drive.

5. Lieutenant Robert Love of the Fairfield Police Department testified that all of these measures are "feasible". He stated that completion of a shopping mall, now under construction, would necessitate the installation of traffic lights.

cases, the distance would be far less than 1.1 miles, because students live between the two schools.

By whatever means the district court deems appropriate in the exercise of its equity powers, see Brown v. Bd. of Education, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, Robinson must be disestablished as a one-race school. Although we do not require use of any particular method nor approve in advance use of a particular device, we suggest that pairing appears to be the most feasible way to accomplish this goal. Robinson could be paired with Forest Hills or Glen Oaks or with both.

In *Swann, supra,* the Supreme Court said:

> The record in this case reveals the familiar phenomenon that in metropolitan areas minority groups are often found concentrated in one part of the city. In some circumstances certain schools may remain all or largely of one race until new schools can be provided or neighborhood patterns change. Schools all or predominately of one race in a district of mixed population will require close scrutiny to determine that school assignments are not part of state-enforced segregation.

> In light of the above, it should be clear that the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system which still practices segregation by law. . . .

402 U.S. at 25–26, 91 S.Ct. at 1280–1281. The district court relied heavily on this language in sustaining the continued operation of Robinson as a one-race school. Although there may be situations where one-race schools are constitutionally acceptable, Fairfield is not the place. The school district has not satisfied this Court that "genuinely nondiscriminatory", 402 U.S. at 26, 91 S.Ct. 1267, reasons exist why Robinson cannot be integrated. A school system with fewer than two thousand elementary school students, encompassing an area of only three square miles is not the type of "metropolitan area" the Supreme Court envisioned when, in *Swann,* it said that one-race schools may, in some circumstances, be acceptable because of segregated housing patterns. This Court has spoken to the issue of the continued existence of one-race schools.

> In the conversion from dual school systems based on race to unitary school systems, the continued existence of all-black or virtually all-black schools is unacceptable where reasonable alternatives exist. And it is clear that one acceptable way to achieve reasonable alternatives is by pairing schools. The tenor of our decisions is unmistakable: where all-black or virtually all-black schools remain under a zoning plan, but it is practicable to desegregate some or all of the black schools by using the tool of pairing, the tool must be used.

Allen v. Bd. of Public Instruction, 5 Cir. 1970, 432 F.2d 362, 367. See also Pate v. Dade County, 5 Cir. 1970, 434 F.2d 1151; Henry v. Clarksdale Municipal Separate School District, 5 Cir. 1970, 433 F.2d 387; Singleton v. Jackson Municipal Separate School District, 5 Cir. 1970, 432 F.2d 927; Bradley v. Bd. of Public Instruction, 5 Cir. 1970, 431 F.2d 1377; Wright v. Bd. of Public Instruction, 5 Cir. 1970, 431 F.2d 1200; Mannings v. Bd. of Public Instruction, 5 Cir. 1970, 427 F.2d 874. We do not read *Swann* as undermining our previous decisions in any way.

The appellees rely on the fact that the Fairfield zone lines were drawn so as to integrate the schools. The continued existence of Robinson as a one-race school was caused, they argue, by the departure from the school system of the white students who were to attend Robinson under the plan. In other words, because Fairfield was integrated on paper, the appellees would have us consider the abolition of the dual system to be complete and regard any current segregation as de facto rather than de jure. The responsibility of the school district is to "eliminate from the public

schools all vestiges of state-imposed segregation". *Swann, supra,* 402 U.S. at 15, 91 S.Ct. at 1275. Until such time as the dual system is eliminated "root and branch", *Green, supra,* 391 U.S. at 438, 88 S.Ct. 1689, the school district has not fulfilled the responsibility given to it nearly 18 years ago in *Brown.* Fairfield has not yet eliminated all vestiges of the dual system. If and when this is accomplished, the appellees' argument may be appropriate. Until this goal is achieved, affirmative steps must be taken to discontinue the operation of Robinson as a one-race school.

## II. *Secondary Schools*

The appellants also object to the operation of Fairfield High School under the district court's order. The Fairfield High School complex consists of three buildings: the Fairfield High School building, the Fairfield Junior High School building and the Buck building, a concrete building formerly used for parking busses. Under the district court's order of July 22, 1970, Fairfield High is the only high school for academic courses in grades 9 through 12. The use of the formerly black high school has been discontinued. As the high school now operates, there is a principal for students in the Fairfield High School building and a principal, formerly the principal of the old black high school, over the students in the Buck building. Use of the high school building is generally limited to academic courses and use of the Buck building is limited exclusively to vocational courses.[6]

The vocational courses are taken mainly by blacks. The curriculum of Fairfield High School includes required academic courses, academic electives, and vocational electives. Some of the required academic electives are duplicated for vocational students. For instance, a vocational student may take business English or business math instead of the regular English or math courses.

At Fairfield High School there are 59 all-black classes, 26 classes with less than 5 percent white enrollment, 3 all-white classes, and 178 integrated classes. Of the 59 all-black classes, 33 are vocational electives, 8 are academic electives, and 18 are required academic courses. Of the 26 classes with less than 5 percent white enrollment, nine are vocational electives, nine are academic electives, and eight are required academic courses.

The district court found that the segregation of classes, principally in vocational electives, was due to student choice. According to the court below, "the black students are more interested in Vocational training than the white students are".

The appellants argue on appeal that the present operation of Fairfield High School is constitutionally impermissible. They contend that the students are purposely segregated by building with the whites in the high school building and the blacks in the Buck building. They argue that a large number of classes are segregated, not because black students choose vocational courses and white students do not, but because school administrators and faculty encourage, if not force, black students into certain classes. Finally, they contend that duplicate course offerings in required academic courses and academic electives are not maintained to accommodate the educational needs of vocational students but rather to segregate blacks from whites in these courses.

School officials may not perpetuate a dual educational system by maintaining segregated classes within a single building, Johnson v. Jackson Parish, 5 Cir. 1970, 423 F.2d 1055, nor may they keep the races apart by using separate buildings, see Lemon v. Bossier Parish, 5 Cir. 1971, 446 F.2d 911, nor may a school district use differential course offerings for certain groups of students to segregate students, see George v. O'Kelly, 5 Cir. 1971, 448 F.2d 148. See also Banks v. Claiborne Parish, 5 Cir.

6. Vocational and academic courses are taught in the junior high school building.

1970, 425 F.2d 1040. There may be valid educational reasons why students in vocational courses are offered special classes in required academic courses and academic electives; there may be non-discriminatory reasons why the Buck building, presided over by a black principal, houses vocational courses attended mainly by blacks. Students may choose to take vocational electives because of personal preference rather than because of discriminatory encouragement by school officials. Finally, certain required academic courses and academic electives may be all-black because there are not enough whites enrolled in the particular subjects to allow all classes to operate on an integrated basis.

From this record, we cannot determine whether the current method of operation of Fairfield High School is constitutionally infirm. We, therefore, remand the case to the district court for a hearing at which the court should receive evidence and enter findings of fact as to:

1. the building in which each class at Fairfield High School is held;

2. why the vocational courses are all in one building;

3. why the required classes are segregated, or nearly segregated, in certain instances;

4. how students are selected, encouraged, or assigned to the vocational courses;

5. why classes in required subjects and electives are duplicated for vocational students;

6. how students are selected, encouraged, or assigned to the special required and elective courses for vocational students;

7. the specific measures the school should undertake to minimize the risks incident to school children crossing Wiebel Drive.

If the district court finds, in light of governing law, that Fairfield High School is operated in a discriminatory manner in any of these respects, the plaintiffs should be afforded relief. We of course hope, as with all school cases, that the parties can voluntarily, without judicial compulsion, fashion means for abolition of state-imposed segregation.

Reversed and remanded.

COLEMAN, Circuit Judge (dissenting).

It is always with reluctance and regret that I file a dissenting opinion. I recognize that the opposing views of my Judicial Colleagues are most conscientiously entertained. I try never to disregard my own fallibility. This, however, is a case in which I feel that I must record my disagreement with the majority opinion, a course which generally I do not follow.

As the majority opinion indicates, this case was remanded to the District Court for further findings because of the familiarity of the District Court "with local conditions". Now that these findings have been made the majority declines to be bound by them.

When a trial court has made its choice between two permissible views, such a choice is not clearly erroneous, United States v. Yellow Cab Company, 338 U.S. 338, 342, 70 S.Ct. 177, 94 L.Ed. 150 (1949). It is not a function of a reviewing court to decide factual issues de novo, Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S. Ct. 1562, 23 L.Ed.2d 129 (1969).

The District Court was "of the clear and certain conviction" that the pairing of the elementary schools would be a "very dangerous undertaking". The majority orders it anyway. I would not hazard the lives and safety of children in an effort to eliminate one "all black" school which quite evidently is simply the product of the racial composition of the neighborhood. The personal safety of the child, black or white, has been, and always should be, the first, the mandatory, concern of everybody, more especially the Courts.

The District Court found that the composition of the classes in vocational

electives was the result of student choice. This finding too, is rejected. The Court whose findings are thus rejected is directed to make further findings in six different areas of school administration that really, in my opinion, have already been answered in the primary findings.

For these reasons, I would affirm the judgment of the District Court.

## ON PETITION FOR REHEARING AND PETITION FOR RE-HEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.