George Robert **BOYKINS**, etc., et al., **Plaintiffs-Appellants,**

**United States of America, Plaintiff-Intervenor,**

v.

**FAIRFIELD BOARD OF EDUCA-TION et al., Defendants-Appellees.**

No. 73–1089.

United States Court of Appeals, Fifth Circuit.

April 12, 1974.

---

**698**

Demetrius C. Newton, Birmingham, Ala., Norman Chachkin, Sylvia Drew, Charles S. Ralston, New York City, Orzell Billingsley, Jr., Birmingham, Ala., for plaintiffs-appellants.

Maurice F. Bishop, Birmingham, Ala., Gray, Seay & Langford, Montgomery, Ala., Donald B. Sweeney, Jr., Birmingham, Ala., for defendants-appellees.

Wayman G. Sherrer, U. S. Atty., Birmingham, Ala., Paul F. Hancock, Dept. of Justice, Civil Rights Div., Ed. Sec., Washington, D. C., for other interested parties.

Before GODBOLD, DYER and GEE, Circuit Judges.

GEE, Circuit Judge:

As the Fairfield, Alabama, school case comes before us for the seventh time,[1] the great issues of segregation and integration which were, for our circuit, largely fought out on this very field[2] have departed like the Captains and the Kings, to be replaced by the petulance which this record reveals and the spectre of resegregation by white flight from the school system. As the trial court observed:

> The Court has had many hearings in the Fairfield School Case. When the hearings began there was a white majority in the school system. There is now a black majority and this majority is growing with every term and with every court order. The number of students in the System is dropping every year with the consequent loss of revenue. The cooperation between the races apparently has disappeared. Pi-

---

1. United States v. Jefferson County Bd. of Ed., 372 F.2d 836 (5th Cir. 1966), aff'd en banc, 380 F.2d 385; Boykins v. Fairfield Bd. of Ed., 399 F.2d 11 (5th Cir. 1968); Boykins v. Fairfield Bd. of Ed., 421 F.2d 1330 (5th Cir. 1970); Boykins v. Fairfield Bd. of Ed., 429 F.2d 1234 (5th Cir. 1970);

Boykins v. Fairfield Bd. of Ed., 446 F.2d 973 (5th Cir. 1971); Boykins v. Fairfield Bd. of Ed., 457 F.2d 1091 (5th Cir. 1972).

2. See the landmark panel and en banc opinions at 372 F.2d 836 (1966) and 380 F.2d 385 (1967).

cayunish claims are being made on the one hand and vigorously contested on the other. If this System is to survive this continued litigation must come to an end. Many of the black students appear to have overlooked the point that the object of attending Fairfield High is to obtain an education and not merely to maintain a point of which an issue may be made.

Appellants are Negro school children who are members of the class who brought this suit originally. They complain of the process by which nine Negro students were punished for misconduct, of the severity of the punishment which some received, and of the refusal of the district court to order the school authorities to grant various demands which the Negro students had sought to enforce by the boycott which led indirectly to their expulsion. We affirm.

Following the most recent remand of this case to the district court, a final plan for the desegregation of the Fairfield schools was put into effect. When school next commenced, however, Negro students conducted a boycott of the school, seeking to enforce demands such as that the School Board:

1. Prohibit the practice of requiring spring pre-registration of classes although, as the court below found, all students, Negro and white, were required to pre-register and no discrimination was shown.

2. Prohibit school authorities from allowing white students to leave campus for lunch since it was generally more convenient for them to go home for lunch than for Negro students.

3. Prohibit the school from serving inferior food to Negro students, although all students eat in the same two cafeterias.

4. Increase the time for lunch, and the time between classes.

5. Order that more Negro students become cheerleaders and members of the band, even though the present selection process was found by the district court to involve no racial discrimination.

6. Order more Negro students to become members of the Pep Club even though membership is open to all students.

7. Require a Negro History Week, and a Black Studies curriculum.

8. Require "sock hops" and school proms.

9. Change the school disciplinary policy which makes it a school offense to be late for class an excessive number of times.

10. Require the school to open the school doors before 7:30 each morning.

11. Order teachers at the Fairfield School System to refrain from using profanity.

12. Allow Negro students to attend dancing class without paying the fee required of other students.

13. Require the school officials to distribute textbooks which are in better condition.

This boycott, commenced in late October and carried over into early November, resulted in the suspension of over 100 students, all but three of them Negro, from school. A series of motions by counsel for plaintiffs followed, seeking enforcement of such demands as the above and reinstatement of the suspended students. On November 9, 1972, the court below entered its order requiring the readmission of the suspended students and setting a hearing on the motion seeking review of the demands upon which the boycott had been based. The ordered readmission was contingent upon termination of the boycott, return to class by all students, and an end of disruptive activities.

Most students returned to class the next day. Almost immediately, however, the same sort of difficulties which had plagued the school term recommenced. Clarence Young, one of the students who was later expelled, intervened in a trivial incident and undertook to instruct a Negro faculty member as to the proprieties of his behavior. An altercation between them followed. Young berated

the instructor, using such epithets as "Uncle Tom" and "half whitey." He was taken to the principal's office, and word of the incident immediately spread through the school. Various students, including the other expellees, left class without permission. Some, urging others to join them, went from classroom to classroom calling for students to leave classes to participate in a meeting to discuss what should be done to rescue Clarence Young. Many students left class, the police were called, and attempts were made to persuade the students to return to class without much success. School was therefore closed in the middle of the morning and all students sent home.

Twenty-one students were subsequently sent notices of suspension from school for their participation in the disruptions of November 10 and were also informed that individual hearings would later be held by the Board of Education to decide whether they should be reinstated. These hearings were held on November 25, 1972. As a result of the hearings, four of the students were immediately readmitted, eight were readmitted after a week's further suspension, one was suspended for the remainder of the semester, and eight were expelled. The record indicates that, as a result of the expulsion, difficulty was later encountered by the expelled students in obtaining entrance to other public schools. As of a hearing held by the district court in March of 1973, none of these students had reapplied to the Fairfield School Board, so that what the consequences of such a reapplication would have been are unknown. However, at oral argument the court was advised by counsel for plaintiffs that all but one of these students were attending school somewhere as of that time.

The procedures which were followed in the hearing, and of which complaint is here made, were outlined by counsel for the Board as follows:

Let me ask you if this procedure will be agreeable. We will call each student from outside into the conference room with his parent or guardian. We will explain to the child what he has been charged with, and ask him if it is clear in his mind what school rules he has violated. If he has no questions, we will then present the evidence against the child to support the accusations. Having done that, we will ask the student if he has anything to say to contradict the charges that have been made against him, or the evidence to support charges that have been made against him. After that we will—I think the Board should ask the School Administrator that is presenting the evidence any— and the child—any questions that you think are relevant in order to resolve any conflict. We're going to accord Mr. Newton the privilege of cross-examination. It is not a right that he can insist on, but we are showing him that courtesy. After the Board, after the school and the child have presented whatever evidence they want, then we will excuse the child and go on to the next student. Is that an agreeable process?

Each student was represented by the same counsel, Mr. Demetrius C. Newton, and the only objection to the suggested procedure voiced by him was a desire on his part to himself determine and declare whether the student understood the charge against him rather than have the student make and state his determination of that matter.[3] The suggested procedures were uniformly followed in conducting the Board's hearings.

█ Appellants principally complain that much of the evidence upon which the expulsions were based consisted of what was technically hearsay. This is undoubtedly correct. The main witness against the students was the school principal, Mr. Hershell Turner, who had investigated the charges against the stu-

---

3. In the event, the charges were of such a simple nature, e. g., reviling the teacher before the class, or leaving class after having

been told not to do so, that no problem was presented.

dents and who presented the results of his investigation of each incident to the School Board. In some instances Turner had first-hand knowledge, and in others his testimony was based on attendance records and other reports which could likely have been qualified under exceptions to the hearsay rule; but in main it consisted of reading or reciting statements made by teachers in response to his inquiries.

As to this contention, appellants correctly concede that the present rule of this circuit in school discipline cases affords them no comfort. "[T]he student should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies." Dixon v. Alabama State Board of Education, 294 F.2d 150, 159 (5th Cir. 1961). They contend, however, that we should read the Supreme Court's *Goldberg*[4] and *Morrissey*[5] decisions as expanding the requirements of *Dixon* to add to them universal confrontation and cross-examination of witnesses, especially where severe punishments are meted out on disputed facts. We decline to do so.

There is a seductive quality to the argument—advanced here to justify the importation of technical rules of evidence into administrative hearings conducted by laymen—that, since a free public education is a thing of great value, comparable to that of welfare sustenance or the curtailed liberty of a parolee, the safeguards applicable to these should apply to it. At argument appellants' counsel, in response to questions, opined that a right to appointed counsel was probably also existent. In this view we stand but a step away from the application of the *strictissimi juris* due process requirements of criminal trials to high school disciplinary processes.

And if to high school, why not to elementary school? It will not do.

■ The requirements of due process are sufficiently flexible to accommodate themselves to various persons, interests and tribunals without reduction to a stereotype and hence to absurdity.[6] As Mr. Justice Stewart, writing for the Court, stated in Cafeteria Workers v. McElroy, 367 U.S. 886, at 895, 81 S.Ct. 1743, at 1748, 6 L.Ed.2d 1230 (1961):

The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. [citations omitted] " '[D]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." It is "compounded of history, reason, the past course of decisions . . . " Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 162–163, 71 S.Ct. 624, 643, 95 L.Ed. 817, 848, 849 (concurring opinion).

Basic fairness and integrity of the fact-finding process are the guiding stars. Important as they are, the rights at stake in a school disciplinary hearing may be fairly determined upon the "hearsay" evidence of school administrators charged with the duty of investigating the incidents. We decline to place upon a board of laymen the duty of observing and applying the common-law rules of evidence.

Indeed it is plain that *Morrissey* does not go so far as appellants would have us take the Fairfield Board of Education. The right of confrontation and cross-examination there discerned in the parolee is not absolute but may be denied for good cause, and the receipt of evidence which would be barred by the hearsay rule is specifically suggested. *Morrissey, supra* 408 U.S. note 5, at 489.

4. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

5. Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

6. "[T]he standards of procedural due process are not wooden absolutes. The sufficiency of procedures employed in any particular situation must be judged in the light of the parties, the subject matter and the circumstances involved." Ferguson v. Thomas, 430 F.2d 852, 856 (5th Cir. 1970).

It well may be that all *Morrissey* contemplates on this head is precisely what appellants were accorded: a right to confront and cross-examine such adverse witnesses *as appear*, without the technical strictures upon their testimony of the hearsay rule. But whether or no, we reject the attempted analogy of student discipline to parole revocation or the termination of welfare benefits. Cf. Student Discipline, 45 F.R.D. 133, at 142. The situations treated are simply too disparate to permit an uncritical transfer of specific due process requirements from one to the other.

■■ Complaint is also made of the severity of the punishment imposed on those who were expelled. The punishment was severe, but we cannot say that it was so severe as to have been arbitrary or clearly unreasonable. It is agreed on all hands that school officials exercise a comprehensive authority, within constitutional bounds, to maintain good order and discipline on school grounds. *E. g.*, Tinker v. Des Moines Community School Dist., 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Bright v. Nunn, 448 F.2d 245, 249 (6th Cir. 1971). And in Ferguson v. Thomas, *supra* note 6, 430 F.2d at 859, we noted that the findings of school agencies " . . . when reached by correct procedures and supported by substantial evidence, are entitled to great weight. . . . "

The Fairfield School Board was presented with a situation of recurring disorder which bid well to disrupt finally a school year already crippled. Firm action was called for and was taken, but no indiscriminate or mass discipline was imposed. The punishment meted out was such as has traditionally been imposed by school authorities in severe cases. The district court has reviewed the evidence supporting the Board's action in each instance, as have we, and has concluded that it is substantial. We have held that due process was accorded, and we cannot say that the findings of the court below were erroneous.

■ Finally, appellants complain of the refusal of the district court, in the name of integration, to require the Board to accede to such demands as are quoted above. Whatever merit these propositions may have as suggestions to the School Board, on the record they are not for our cognizance. The court did not err in finding from the evidence presented that each of them was either insubstantial or involved no racial discrimination. It appears that Fairfield's dual school system is drawing to a close and with it, we may hope, this long case.

Affirmed.

GODBOLD, Circuit Judge (dissenting in part):

I must record a partial dissent, to that part of the decision which affirms the expulsion of eight black students.

The power to expel students is not unlimited and cannot be arbitrarily exercised. Dixon v. Alabama State Board of Education, 294 F.2d 150, 157 (CA5, 1961).

> Turning then to the nature of the governmental power to expel the plaintiffs, it must be conceded . . . that that power is not unlimited and cannot be arbitrarily exercised. Admittedly, there must be some reasonable and constitutional grounds for expulsion or the courts would have a duty to require reinstatement.

Only recently we said that there can be such shocking disparity between an offense by a pupil and the disciplinary penalty imposed upon him by school authorities that the commands of the Fourteenth Amendment have not been met. Lee v. Macon County Board of Education (Randolph County), 490 F.2d 458 [CA5, 1974]. Accepting the foregoing principle, the majority hold, though without discussion of the underlying facts, that the expulsions of eight pupils were not so severe as to have been arbitrary or clearly unreasonable.

## 1. The facts.

The background is as stated in the majority opinion. Operation of the Fairfield school system has been a fruitful source of litigation. The Board is now before us for at least the seventh time.[1] This is not to say that the Board cannot be right and blacks cannot be wrong, but that the Board's track record in desegregating the system must be considered as part of the overall circumstances of the present case. More than 100 students were suspended from the Fairfield High School because of repeated absences during a black boycott. On November 9, 1972, those suspended were ordered by the District Court to be readmitted, contingent upon termination of the boycott, return of all students to classes, and an end to disruptive activities. Readmissions began on the morning of November 10. The Board takes the position, and the District Court agreed, that the eight pupils were expelled for what they did that day. Let us see what it was.

Clarence Young: Events involving him triggered the difficulties of November 10. The charge against him was:

He was disrespectful for authority and carrying on in the hall as in the sense of inciting something among the students.

The testimony against him came from Coach Evans, a Negro, plus a brief statement by Principal Turner. From the testimony the Board could conclude that the following events occurred. It was necessary for suspended students to get passes from the guidance office to return to classes. On the morning of November 10 students began walking into the building where the guidance office was located. Young

seemed to be directing other students to come in the building because he stopped at the front door at the main entrance up there mouthing off at the other students, and getting, like he was getting everything together for them to march in the room.

Coach Evans opened a door and the door struck a male and then a female student in the line of students waiting to get passes. Evans apologized to them. Either before he apologized, or while he was doing so, or immediately after he had done so—the facts are unclear—Young told him he owed an apology to the female.[2] Immediately thereafter other students began talking with Young. Evans considered that Young "was trying to bring the crowd on," that Young was "for the wrong thing." Coach Evans felt "in my expectation, he didn't come there to go to school that day. That is my expectation. I could be wrong." Evans secured a pass for Young and gave it to him so that he would go on to class. As Young walked away he referred to Evans as "Uncle Tom" and "Half Whitey". As Young crossed an open area en route to his

---

1. United States v. Jefferson County Bd. of Ed., 372 F.2d 836 (CA5, 1966), aff'd en banc, 380 F.2d 385 (1967) [reversing decision in favor of Board, ordering desegregation of schools and permitting freedom of choice]; Boykins v. Fairfield Bd. of Ed., 399 F.2d 11 (CA5, 1968) [reversing Board's denial of freedom-of-choice applications of blacks to transfer to formerly all-white schools]; Boykins v. Fairfield Bd. of Ed., 421 F.2d 1330 (CA5, 1970) [reversing because freedom-of-choice not operating acceptably and school attendance zones drawn by Board in a manner reducing rather than furthering desegregation]; Boykins v. Fairfield Bd. of Ed., 429 F.2d 1234 (CA5, 1970) [remanding because desegregation plan of Board did not change status of integration in elementary schools and did not explore possible alternatives as to junior and senior high schools]; Boykins v. Fairfield Bd. of Ed., 446 F.2d 973 (CA5, 1971) [remanding for reconsideration in the light of new Supreme Court decision]; Boykins v. Fairfield Bd. of Ed., 457 F.2d 1091 (CA5, 1972) [reversing and remanding for failure to desegregate an all-black school and for additional hearing on issue of whether black high school students were being purposefully segregated by being placed in classes held in a separate building].

2. This is the incident that the majority opinion describes as Young's "under[taking] to instruct a Negro faculty member as to the proprieties of his behavior."

class he was seen to be "carrying on." A city councilman present saw him and told Evans he should have a talk with Young because "it looks like he is for the wrong thing."

Coach Evans engaged Young in conversation, and Young took the position he had done no wrong and was being "picked on." Possibly he repeated the racial epithets he had earlier used. Evans took him to the principal's office and talked with him. Young was excited and talked sufficiently loudly that a staff member suggested that the principal also go into the office, and Principal Turner went in and stayed briefly. A friend of Young's called his mother, she came to the office, and in the ensuing conversation she twice told her son to "simmer down."

Evans testified that he did not consider Young to be a leader of the other students. He did, however, hear Young telling other students to get their passes. Evans disapproved of this, though his reason is unclear, since without dispute the necessity for passes was being communicated by word of mouth.

As Judge Gee's opinion points out, word spread about the difficulty with Young, some black students left their classes, and some went to other rooms and called for other students to leave classes and join in a meeting to discuss what should be done about the incident. A group gathered outside the principal's office where conversations with Young were, or had been, going on. That brings us to the facts concerning the other expellees.

Jacque Guest: The charge was that he left class without permission and encouraged other students either not to go to class or to walk out of classes. He admitted the offense, including going to another classroom and encouraging students to leave.

Beverly Claiborne: The charge against her was twofold: first, that she obtained a pass but did not go to her first period class; second, that subsequently Principal Turner told her she was expelled and began to explain something to her [apparently her right to a hearing], whereupon she got up and left his office and in an outer office, in the presence of members of his staff and other students, used profanity concerning him.[3] Miss Claiborne admitted saying the words but claimed she had said them to herself and not "out loud."

Linda Meadows: The charge was that she came to a classroom other than that to which she was assigned, the teacher told her to leave, and she cursed him in the presence of the class and left. The Board was entitled to accept the written statement of the teacher that this occurred. It could accept Miss Meadows' testimony that her purpose in going to the classroom was to see if other students who had participated in the walkout were in the room. There is, however, no evidence that she or anyone with her urged students in the classroom to leave class or indeed said anything to them. On cross examination of Miss Meadows the Board attorney questioned her concerning whether she went to classrooms other than to one to which she admitted going, and she denied doing so, and there is no evidence that in fact she did.

Darlene Phelps and Cathy Scott: The charge was leaving their first period classroom without permission. The Board could accept their teacher's statement that they did so. Miss Phelps acknowledged going to another classroom, stating that she went to a study hall and complained to the teacher about what was occurring [presumably the events of the morning]. That teacher neither testified nor gave a statement, and there is no evidence that Miss Phelps attempted to get students to leave the study hall, or indeed that she said anything to the students, or that her conduct was disruptive. Faculty member Bird testified that in the presence of Cathy Scott he

---

3. The verbiage is unrevealed because at the Board hearing it was not verbalized but written on a piece of paper that was handed around and discussed.

told a group of students to return to their classes.

John Hall and Beverly Law: They were present for the hearing before the Board but, after several hours, left before their cases were reached. The Board heard their cases in their absence. The evidence against them, which the Board could accept, was the written statement of their teacher that they left class without permission after being told repeatedly to remain.

### 2. The District Court order.

In reviewing the Board action, the District Court recognized, citing *Dixon*, that part of its function was to determine "whether there was evidence of some reasonable or constitutional ground for the action taken in imposing the sentence of expulsion." In rejecting plaintiffs' contention that the expellees were punished because they had been leaders in the boycott *before* November 10, the court said:

> The evidence does not show that these students were disciplined for being leaders in the boycott prior to November 10, 1972, *but the fact that they became leaders in the continuation of the demonstration on November 10, 1972, was a matter certainly material for the consideration of the school authorities* in view of the Court's order of November 9, 1972, and the school authorities' attempt to prevent further demonstrations and disturbances when school reconvened on November 10, 1972. (Emphasis added.)

The facts, as set out above, reveal that the District Judge's premise that the eight expellees were "leaders in the continuation of the demonstration on November 10" was wrong, at least with respect to Phelps, Scott, Hall and Law. Phelps' offense was to leave her class, go to another classroom and register a complaint with the teacher. Scott left her class and later was where she could

have heard a teacher tell students to return to class. Hall and Law left their class after being told not to. Turning to the other four, the Board could accept that part of Evans' testimony tending to describe the actions of Young as a leader.[4] Guest's actions were those of a leader. Claiborne and Meadows cannot accurately be described as leaders.

The situation on November 10 was volatile. School officials were attempting to defuse it and get on with the primary job of educating young people. It was important that students go to and remain in their classrooms. Conduct that in a different atmosphere might have called for less severe punishment could, under these particular circumstances, justify more severe penalties. Cf. Dunn v. Tyler Independent School District, 460 F.2d 137 (CA5, 1972). In my view the expulsions of Young and Guest were within constitutional bounds. I am much less certain as to Claiborne and Meadows—I have the feeling that in the calm light of another day the District Court might not have sustained their expulsions but for the fact he erroneously thought they were leaders in re-igniting disorder. I am not uncertain as to Phelps, Scott, Hall and Law. What they did, and all that they did, was to leave their classrooms without authority just as did numerous others on the same occasion. With respect to these four, there is no evidence that any one of them urged any other student to leave class or disturbed any classroom, participated in any disorder (other than leaving class) or committed any act of leadership. A sentence of life-time exile from the public school system of the place where they reside cannot stand under these circumstances.

> [A] sentence of banishment from the local educational system is, insofar as the institution has power to act, the extreme penalty, the ultimate punishment. In our increasingly technological society getting at least a high

---

4. Also Young's expulsion was independently sustainable on the basis of his use of epithets directed at Coach Evans.

school education is almost necessary for survival. Stripping a child of access to educational opportunity is a life sentence to second-rate citizenship, unless the child has the financial ability to migrate to another school system or enter private school.

Private citizens, law making bodies, and the media all bend their efforts toward encouraging children to complete their high school educations and to avoid becoming dropouts and burdens to society. In the twenty years since Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), this country has committed itself to a policy against state-imposed public school segregation. It is not lesser but more stringent state action to bar a child forever from public school, with the result that he secures no education at all.

Lee v. Macon County Board of Education, *supra*, 490 F.2d p. 460.

The plaintiffs urge that they were singled out for expulsion for reasons other than what they did on November 10. There is good circumstantial evidence supporting that claim. After their expulsion at least four of them attempted to enroll in other public high schools in adjacent geographical areas, and were informed that each would have to secure an "OK" from the Fairfield superintendent to do so. They approached him, asked his approval, and it was refused. The superintendent testified that all transcripts and other required records were furnished but that affirmative statements in the form of any "OK" or "recommendation" were denied. Obviously the superintendent had no legal duty to assist these young people to get into schools elsewhere. But I confess my inability to understand the unwillingness to lift a finger—even to the extent of a statement saying "we expelled them for good reasons, but if you want to accept them we do not object." Sentence of exile was coupled with a specific refusal to act, with the consequence that the effective scope of exile was broadened to include adjoining geo-

graphical areas as well. The Board's argument that it does not control the admission policies of other schools is a subterfuge. No one contends that it does. The Superintendent's refusal cut off at the threshold the possibility that other systems, pursuant to their own admission policies, might have been willing to accept the students.

Secondly, there was obvious disparity in penalties. Numerous students left their classes without permission. A number of those charged for doing so were not expelled, including one who left ostensibly to go home but remained on the school grounds knowing that he was not supposed to do so; another who left and went home; a third who left class in response to students coming to his classroom and telling him about Clarence Young.

Thirdly, the Board declined to receive evidence of prior conduct, good or bad, by the charged students. It announced that it was limiting itself to consideration of events of November 10. This, of course, makes the disparity in punishments more suspect. It leaves no explanation, or even attempt at explanation, for the wide disparities. The Board's response is that it is entitled to impose differing penalties. Indeed it has that authority but the presence of power is not an explanation for the manner of exercise. Additionally, this limitation of evidence by the Board accentuates more sharply the erroneous premise by the District Judge that all expelees were leaders on November 10.

With apparent determination to drive every nail into the coffin, the majority make the point that none of the students reapplied for admission, so that what the consequences of reapplication would have been are unknown. This was hardly a promising request to be made to a system that would not even "OK" an attempt to apply for admission to another system, but pretermitting that point, there is no such requirement as a condition precedent to judicial consideration or judicial relief, nor does failure to reapply diminish the finality of the

Board's decision of permanent expulsion. Also, while it is not a matter of formal record, the court inquired at oral argument about the ultimate fate of the expellees. We were told that some were admitted to parochial schools where tuition is required, at least two are attending schools in another state, and one is known to be out of school. The Fairfield system records on each of the eight students continue to reflect that he or she was permanently thrown out of the system and imply that each was guilty of conduct justifying that penalty. This impediment to college admission and to public and private employment is now made immutable. Thus the statement by the majority that all but one of the eight were able to find schooling elsewhere is mere legal soothing syrup neither mitigating the wrong nor mooting the case.