**David VOUGHT, by his Next Friend Joseph Vought, Plaintiff,**

v.

**VAN BUREN PUBLIC SCHOOLS, a public body corporate, Charles Bole, President of the Van Buren Public Schools Board of Education, John Ford, Principal of Belleville High School, Dale Kaulitz, Superintendent of Van Buren Public Schools, Jointly and Severally, Defendants.**

Civ. No. 32688.

United States District Court
E. D. Michigan, S. D.
May 8, 1969.

Supplemental Opinion June 13, 1969.

Lawrence W. Sperling, Ypsilanti, Mich., for plaintiff; Burgess & Burgess, by Laurence Burgess, Detroit, Mich., Sugar, Schwartz, Silver, Schwartz & Tyler, by William C. Gage, Detroit, Mich., of counsel.

Tinkham, Snyder & MacDonald, by John E. MacDonald, Wayne, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

THORNTON, District Judge.

The plaintiff in this case is sixteen-year-old David Vought, an eleventh grade student at Belleville High School (Wayne County, Michigan) as of March 25, 1969, who, on that date, was verbally informed by the Principal he must leave school. This was done in his and his mother's presence in the office of the Principal. At that time they were told that they could appear at a school Board meeting when the matter would be brought up, and that they would be informed when this would be. After that, plaintiff's parents received a letter from the Principal, dated March 31, 1969, which had a memorandum attached to it containing a recommendation by the Principal to the Van Buren Public Schools Board of Education recommending to them that the plaintiff here be "expelled from Belleville High School for the remainder of this school year." The letter itself was one of transmittal and of advice to the effect that plaintiff's parents would be advised of the "date, time and place of the Board meeting at which this matter will come before it." That letter was received by plaintiff's parents April 1, 1969. On April 2, 1969 they received another letter (dated April 1, 1969) which reads as follows:

"April 1, 1969

Mr. and Mrs. Joseph Vought
1356 DeSoto
Ypsilanti, Michigan 48197

Dear Mr. and Mrs. Vought:

I sent a letter to you yesterday regarding your son David, and enclosed a memorandum to the local Board of Education recommending that David be expelled for the remainder of this school year. I told you that when this matter came before the Board you would be notified and could appear at that meeting if you so desired.

The Board of Education held a special meeting last night and I was asked to be present to discuss this matter with them. The Board of Education decided at this meeting to expel David for the rest of this school year.

David may return to school next Fall if he so wishes. The next regular meeting of the Board of Education will be held on Monday, April 11, 1969, if you wish to address the Board on this matter.

Sincerely yours,
/s/ John Ford
John Ford
Principal"

The April 11th meeting was in fact held on April 7th. Plaintiff had become aware of this change in date and he and his parents, with plaintiff's attorney, appeared at this Board meeting for the purpose of seeking reconsideration and rescission of the expulsion of the plaintiff by the Board. These were not forthcoming, and on April 21st the plaintiff filed his Complaint in this Court, invoking jurisdiction under 28 U.S.C.A. § 1343. Injunctive relief and damages are sought under the authority of 42 U.S.C. § 1983. Plaintiff alleges in Paragraph I of his Complaint that "the rights, privileges and immunities sought herein to be redressed are those secured by the First and Fourteenth Amendments of the Constitution."

At the time of filing the Complaint plaintiff also filed a motion for temporary restraining order and a motion for preliminary injunction. This Court granted the former, ex parte, and set a hearing date on the latter for seven days later. The effect of the temporary restraining order was to reinstate plaintiff as a student immediately. At the date set for the hearing on the motion for preliminary injunction the Court entertained a motion to dismiss by defendants. This was argued to the Court by both parties. The basis for the motion was alleged lack of jurisdiction. On the authority of Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939, the Court de-

nied defendants' motion to dismiss and proceeded to a hearing on plaintiff's motion for preliminary injunction. Testimony was taken from both parents of plaintiff, from plaintiff himself, from the Secretary of the defendant Board of Education and from two experts concerning the obscenity question. At the conclusion of plaintiff's presentation defendants moved for dismissal of the action on the ground that plaintiff failed to prove that either the First (specifically free speech) or Fourteenth (specifically due process) Amendment rights of plaintiff had been violated. This memorandum addresses itself to the above motion to dismiss made by defendants and argued to the Court by counsel for the respective parties.

The facts pertinent to our discussion here do not appear to be in dispute. We summarize them by quoting from the plaintiff's Complaint, Paragraphs VIII through XVII:

"VIII.

On said date of March 13, 1969, during school hours, Plaintiff had in his possession on the premises of BELLE-VILLE HIGH SCHOOL several copies of a four-page publication entitled 'White Panther Statement.'

IX.

Near the end of the school day on said above date, Defendant JOHN FORD came to Plaintiff's classroom, ordered Plaintiff out of class, grabbed all copies of the 'White Panther Statement' from Plaintiff's possession and, although Plaintiff offered no resistance whatsoever, Defendant FORD hit him in the face causing Plaintiff pain and suffering.

X.

Defendant FORD also sent Plaintiff home and informed his parents that a parent would have to come to school before Plaintiff would be readmitted.

XI.

Subsequently on March 14, 1969, Plaintiff's mother accompanied Plaintiff to Defendant FORD'S office. At that time, Defendant FORD read to Plaintiff and his mother a memorandum stating in essence, to the best of Plaintiff's memory, that any student found with obscene literature in his possession in the future would be suspended from school. Defendant FORD indicated to them that this policy had been read to the school students for the first time that morning, March 14, 1969, and was effective as of that date. Plaintiff was then returned to his usual classes.

XII.

On or about March 21, 1969, Plaintiff, while cleaning his locker, found an old issue of a tabloid printed newspaper called 'Argus' and dated February 13–27, 1969. Plaintiff took the publication from his locker and placed it in his notebook in order to take it out of and away from the school.

XIII.

During the course of the school day; without Plaintiff's knowledge or permission, someone took the 'Argus' from his notebook.*

XIV.

Several days later, on or about March 25, 1969, Plaintiff was called to Defendant FORD'S office and informed by Defendant FORD that he must leave school until further notice, because it had been reported that Plaintiff had had the issue of 'Argus' in his possession. Plaintiff and his mother were each told verbally that they would be informed when the matter would be brought before a school board meeting so that they could appear at that time.

---

\* There is apparently an area of disagreement as to whether or not the "Argus" was taken from plaintiff's notebook or whether he in fact gave it to another student.

## XV.

Thereafter, Plaintiff's parents received a letter dated March 31, 1969, a copy of which is attached hereto as Exhibit 'A' informing them that Defendant FORD was recommending expulsion of Plaintiff for the remainder of the school year and again telling them they would be informed as to the date, time and place of the meeting at which the Board of Education of Defendant VAN BUREN PUBLIC SCHOOLS would consider the matter. This letter was received April 1, 1969.

## XVI.

The next day Plaintiff's parents received another letter from Defendant FORD dated April 1, 1969, a copy of which is attached hereto as Exhibit 'B', stating that the Board of Education, acting for Defendant VAN BUREN PUBLIC SCHOOLS, had met the previous night and decided to expel Plaintiff. No notice of said meeting written or verbal had been given to Plaintiff or his parents.

## XVII.

Subsequently, on April 5, 1969, Plaintiff, through his attorney, sent a letter to the Board of Education of Defendant VAN BUREN PUBLIC SCHOOLS, and appeared with his attorney before said Board on his and his parents own initiative on April 7, 1969, to request that the Board reconsider and rescind its expulsion of Plaintiff. Defendants have refused to rescind the expulsion."

The Court has been furnished copies of the "White Panther Statement," several copies of which were admittedly in plaintiff's possession on March 13th, and with a copy of the "Argus." Because we do not consider it necessary at this time to rule on the issue of obscenity, per se, we will not here set forth examples of the alleged obscene material. The plaintiff himself testified that in his opinion the "White Panther" material was obscene. He denies, both in his Complaint and in his testimony, that the "Argus" is obscene, but admits that it contains some words that fall within that category.

The alleged deprivation of First Amendment rights to free speech we deem to be an unsubstantial issue in the context of this controversy. The Supreme Court, many years ago, indicated that the right to free speech is subject to some limitation, as is each First Amendment right. Justice Holmes enunciated what was a principle of law in 1919 and which has continued to be such to the present time: "We admit that in many places and in ordinary times the defendants in saying all that was said in the circular would have been within their constitutional rights. But the character of every act depends upon the circumstances in which it is done. * * [Citations omitted.] The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic." Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919).

The Supreme Court, on February 24th of this year, stated that "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students" and that they do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Independent Community School District et al, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, February 24, 1969. The Court states therein that "the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school authorities, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." The Court further states that the problem in Tinker "lies in the area where students in the exercise of First Amendment rights collide with the rules of the school authorities." The issue in Tinker concerned the wearing by the students of black armbands in protesting the Vietnam hostilities. We quote from

*Tinker* further, the first and second paragraphs under Section II:

"The problem presented by the present case does not relate to regulation of the length of skirts or the type of clothing, to hair style or deportment. * * * [Citations omitted.] It does not concern aggressive, disruptive action or even group demonstrations. Our problem involves direct, primary First Amendment rights akin to 'pure speech.'

The school officials banned and sought to punish petitioners for a silent, passive, expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioners. There is here no evidence whatever of petitioners' interference, actual or nascent, with the school's work or of collision with the rights of other students to be secure and to be let alone. *Accordingly, this case does not concern speech or action that intrudes upon the work of the school or the rights of other students.*" (Italics supplied.)

The instant case before the Court does concern regulation in the area of "speech or action that intrudes upon the work of the school or the rights of other students." The exercise by the defendants here of their obligation "to prescribe and control conduct in the schools" must be held to encompass the promulgation of rules concerning the extent to which and the conditions under which obscene materials may or may not be properly on the school premises. See also Interstate Circuit, Inc. v. City of Dallas, 366 F.2d 590 (5th Cir. 1966). Without belaboring the First Amendment issue unnecessarily we are constrained to conclude that the type of regulation here cannot be considered violative of this plaintiff's First Amendment rights.

We now embark upon consideration of the allegation of deprivation of Fourteenth Amendment rights. In his Complaint, at Paragraph XXI, plaintiff alleges that "his expulsion from school was without any semblance of a fair hearing

of the type required by due process of law, and that he has been deprived of his liberty and property by Defendants without due process of law contrary to the Fourteenth Amendment." It is this allegation and the testimony adduced in support of it which gives us cause for concern. At the hearing before this Court there was proof that the procedure described in plaintiff's Complaint as above set forth herein was in fact the procedure that was employed. We have attempted during the past few days to review the cases cited to us by counsel, as well as additional ones that we have become aware of. There exists no dearth of recent cases in this area, both reported and unreported. The majority represent college or university situations. Among those we have found especially helpful in arriving at our conclusion here are: Madera v. Board of Education of City of New York, 386 F.2d 778 (2nd Cir. 1967); Scoville v. Board of Education of Joliet Tp. H.S. Dist. 204, 286 F.Supp. 988 (N.D.Ill.1968); Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961); Meredith v. Allen County War Memorial Hospital Commission, 397 F.2d 33 (6th Cir. 1968).

Whether or not the requirements of due process are met in any particular situation depends upon the circumstances attendant upon that situation. What we say here has application to these facts in this particular situation. We do not attempt, or pretend to establish or set down any due process guidelines for schools, school boards, principals, boards of education or any other educational personnel as such. What we say here deals with this plaintiff and these defendants as they appear in this matter in this posture of this case. The Secretary of the defendant Board of Education, Mr. Hay, was asked by his counsel to state the number of students who had been expelled from Belleville High Shcool. He stated that during his seventeen years on the Board there have been four or five expulsions. In view of the fact that the school has an enrollment of approxi-

mately 2,000, it is abundantly clear that expulsion from Belleville is a rare occurrence. It goes without saying, and needs no elaboration, that a record of expulsion from high school constitutes a lifetime stigma. It would seem that in taking an action of such drastic nature the Board of Education would have been interested in providing plaintiff with the opportunity to offer his explanation of the circumstances *prior* to the actual expulsion action by the Board. The position defendants seemed to take was an adamant one—plaintiff was guilty of violating the school policy as contained in the memorandum which had been read to him and he knew that he was in violation and knew expulsion could result. Therefore, say defendants, nothing more was owed plaintiff by defendants. Plaintiff claims he was entitled to a hearing. Defendants say he got one. Defendants refer to the Board meeting when plaintiff appeared with his parents and his attorney. This was subsequent to the expulsion. Plaintiff had been presented with a fait accompli at this point.

▮▮▮ Our reading of the current bevy of reported cases has convinced us that plaintiff here was not treated fairly. The lack of fair treatment is such as to, in our opinion, constitute denial of due process to this plaintiff in these circumstances. He was entitled to the observance of procedural safeguards commensurate with the severity of the discipline of expulsion. It is unfortunate that after having extended an invitation to plaintiff to be present at the Board meeting when his recommended expulsion would be acted upon the defendants reneged. We attach no legal significance to this aspect of the matter, other than to comment on it. The Court at this time will hold in abeyance the defendants' motion to dismiss in order to give them the opportunity to afford plaintiff a hearing to be held on notice to plaintiff of not less than five days, such hearing to be conducted in accordance with the guidelines laid down in Dixon v. Alabama State Board of Education, 294 F.2d 150, 158 (5th Cir. 1961). These guidelines include notice containing "a statement of the specific charges and grounds which, if proven, would justify expulsion under the regulations of the Board of Education"; a hearing affording "an opportunity to hear both sides in considerable detail" preserving the rudiments of an adversary proceeding; names of witnesses against the student; and the "opportunity to present to the Board * * * his own defense."

The temporary restraining order heretofore issued by this Court will remain in full force and effect until the further order of the Court.

The parties will keep the Court informed of proceedings of actions taken by them pursuant to this order, as such actions are taken.

### SUPPLEMENTAL MEMORANDUM

This Court filed a Memorandum Opinion and Order in this case on May 8, 1969. The factual background of the controversy is set forth therein and is hereby incorporated by reference.

On page 1393 of the foregoing Memorandum is the following:

"The Court at this time will hold in abeyance the defendants' motion to dismiss in order to give them the opportunity to afford plaintiff a hearing to be held on notice to plaintiff of not less than five days, such hearing to be conducted in accordance with the guidelines laid down in Dixon v. Alabama State Board of Education, 294 F.2d 150, 158 (5th Cir. 1961)."

On May 12, 1969 a letter from the attorney for the Van Buren School Board was sent to Mr. and Mrs. Vought, parents of plaintiff, David Vought, a copy of which is attached to this memorandum together with a copy of the "directive" referred to in line 13 of the body of the letter. A reading of the letter discloses that it is responsive to the opportunity given by the Court to defendants to hold a proper hearing, which, in fact, was held (at Belleville High School, Belleville, Michigan) on Monday, May 19, 1969, with a court reporter present. The

Court has been furnished with a transcript of that hearing. Subsequent to the Board hearing the parties appeared before this Court on May 29th, at which time they presented additional arguments in support of their respective positions. At this time there was introduced into evidence J. D. Salinger's "The Catcher in the Rye," Exhibit 14, and the April 1969 issue of Harper's Magazine, Exhibit 15—the latter with specific reference to an article commencing on page 81, entitled "Temptations of a Boston Atheist" by Nat Hentoff, and the former with references to pages 201, 202, 203 and 204. The April issue of Harper's Magazine had been introduced into evidence at the May 19th hearing before the School Board in the following manner:

"MR. SPERLING: If it may be conceded that Harper's Magazine is found in the school library, I would like to introduce the April, 1969 issue of Harper's Magazine into evidence.

Do I have to put on a witness to do that or can this be conceded?

MR. MacDONALD: I have no objection to it. I would object to its relevancy but I have no objection to it.

MR. SPERLING: It is a magazine found in your library, Harper's Magazine, well-recognized.

MRS. ROE: Yep. [Member of the School Board]

MR. SPERLING: And in connection with it, I would like to call the Board's attention to page 82 of it, in which the word—and I have underlined it as Mr. Ford did with the Argus so that you could see it—the word 'f-u-c-k' is used, and on page 84, that word with an '----e-r, at the end and 'mother' in front of it is also used in an article by Nat Hentoff, a writer who has written many books.

And, apparently, I would also like to point out to the Board and point out for your attention the book The Catcher in the Rye, which has been testified to that the boy in this case, David, was required to read in the tenth grade and was read in other classes and is being read, according to his information now, in the ninth grade, and in a book that he said was, when he was in English, he was taught to distinguish between word and content and to use the content. I would say the word 'f-u-c-k' is used once on page 201, twice on page 202, three times on page 204."

It was at this Board hearing that Mr. John Ford, Principal of Belleville High School, was one of two witnesses (the other being the plaintiff David Vought). Quoting again from the transcript of the Board hearing of May 19th, the following questions were asked by plaintiff's counsel, Mr. Sperling, on cross-examination of Mr. Ford:

"Q. Now, what was it that was objectionable about Argus?

A. Well, I think Mr. Sperling, you have looked this over as carefully as I have and you know the words as well as I, and you were hesitant to mention them in court and I am hesitant to mention them here, even though they are not supposed to be obscene.

Q. Is that what you find objectionable about Argus?

A. Yes, sir.

Q. That is, the words that are in there?

A. Yes, sir."

The transcript further reflects the following questions by Mr. Sperling and answers by Principal Ford:

"MR. SPERLING: But you think that a 24- or 25- page publication that has interviews, musical reviews, political articles, advertisements by many stores and so forth is the same as a three-page mimeographed statement of the White Panther ideas?

A. Well, it had the same kind of words and the thing about it is that, to my mind, a dirty intent in the use of these words.

MR. SPERLING: So it is the dirty intent. It is the intent of the use of

the words in there that makes the difference to you?

A. I think so."

The following questions by the attorney for defendants and answers by plaintiff will serve to indicate to some extent plaintiff's frame of mind at the time he removed the Argus publication from his locker. At page 84 of the transcript of the Board hearing on Monday, May 19th, the following appears:

"Q. Were you concerned that if you were found with this,* certain disciplinary action may be taken against you?

A. Yes, that's why I was trying to take it from the school.

Q. Why were you concerned about this, David?

A. Because a friend of mine was suspended with a publication similar to this.

Q. So did you feel it was the type of publication that the school officials may not want you to have in your possession?

A. I didn't feel it was, but I didn't want to take any chance.

Q. But you felt enough fear, if you will, that you put it in a folder and took it with the intent of taking it out of the school? Is that a fair statement?

A. Yes, sir."

Previously, in connection with the same explanation given in response to questioning by his attorney, Mr. Sperling, he also gave the following answer to the following question:

"Q. Did you have some concern when you saw this* in your locker?

A. Oh, yes. I remembered that he was expelled for it and, so, I didn't—I wanted to get it out of school and I didn't want to leave it in my locker because we know —we have locker partners up until we're seniors, and I didn't want my locker partner to take this out and probably be caught with it or something such as that."

It appears from the boy's testimony in toto that he was not sure how the school authorities would regard this publication, and that he was concerned about the possibility of it being considered a prohibited item. This is not the same thing as saying that he knew that he was in possession of material that was in direct contravention of the "directive."

That the exhibit "The Catcher in the Rye" was required reading or offered as optional reading in this school for ninth and tenth graders strikes the Court as an enigma in the light of the stand taken by Principal Ford at the Board hearing. The same enigma exists with relation to the presence of the Harper's Magazine in the school library.

David Vought has been expelled from school for having possession of the Argus publication, on the ground that it contains certain four-letter words. The same four-letter words appear in "The Catcher in the Rye" and the Harper's Magazine. Plaintiff's expulsion is not based on the general content of the Argus, or its literary quality or lack of literary quality, or its philosophic bent, or the type of publication it is, but is based solely on its containing certain four-letter words (or variations thereof)—the same words as appear in "The Catcher in the Rye." If we, as a trial court, are confused, what are we to suppose is the state of mind of a student subjected to such a double standard? If the Argus is obscene within the meaning of the school principal's "directive," then surely "The Catcher in the Rye" and the Harper's article must also be obscene. And if the student is invited and/or required to read

---

* The Argus publication.

the latter two, what can the school authorities have in mind in expelling him for possession of the former?

We are compelled to reject the position of the defendants in this case because it is preposterous on its face. It is contrary to any sense of fairness or consistency—a student, placed in the situation in which this school has placed this student, is required to make a judgment that we, as a court, would find difficult to make.

The plaintiff herein was expelled for possession of a copy of the Argus publication. This is an entirely different type of material from the "White Panther" statements referred to in the "directive." It is a 24-page tabloid-type publication containing serious articles written grammatically, which, according to the testimony of a University of Michigan English professor (a witness in this Court at the first hearing held in this Court on the motion for preliminary injunction), has literary quality and perception, even though it contains certain four-letter words. For possession of this one magazine on one occasion—for this and no more—plaintiff was expelled. The expulsion was based on his "violation" of the "directive." We make the observation that even though plaintiff testified he realized he might be considered in violation of the "directive", the drastic action of expulsion for such single incident, carrying as it does a lifetime stigma, is hardly punishment fitting the crime.

We decline to become involved here in a discussion on obscenity—that area of the law today is about as well-defined as the course of a tornado. We profess no expertise whatsoever in this field, but we do recognize rank inconsistency when we see it. And we see it here. And the inconsistency is so inherently unfair as to be arbitrary and unreasonable, constituting denial of due process, thus compelling us to conclude that the plaintiff's expulsion may not stand.

An appropriate order may be presented in accordance with this memorandum.