**Peggy GIVENS and Rose Mary Givens, Minors, by their next friend and mother, Maggie Givens, Plaintiffs,**

v.

**William E. POE et al., Defendants.**

**Civ. A. No. 2615.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

June 19, 1972.

and (4), for the class consisting of themselves and others similarly situated [Federal Rule 23(a) (b) (2)], seeking reinstatement and other equitable relief under 42 United States Code, § 1983, for alleged denial of constitutional rights (due process and equal protection) under color of state law. The class consists of public school students who have been or may be excluded from school or suspended for substantial periods of time without a prior due process hearing.

The suit was filed on January 27, 1970, and was taken almost immediately by plaintiffs to the Fourth Circuit Court of Appeals. It was returned to this court in early 1971, and reinstated on the trial docket. Discovery then proceeded.

An evidentiary trial was conducted in Charlotte on November 22 and 23, 1971.

■ Meanwhile, in October, 1970, plaintiffs were admitted by defendants to a special public school; this renders moot their request to be readmitted to school but does not moot the rest of the relief sought.

■ The question presented is the due process or fairness of the *procedures* by which discipline in public schools is administered, rather than the substantive correctness of the disciplinary decision or punishment itself; therefore, exhaustion of administrative remedies is not required.

Gail Barber, Martin J. Miller, Jack Ross and Shelley Blum, Legal Aid Society, Charlotte, N. C., for plaintiffs.

Richard A. Bigger, Jr., Weinstein, Waggoner, Sturges, Odom & Bigger, Charlotte, N. C., for defendants.

## PRELIMINARY STATEMENT

McMILLAN, District Judge.

On December 12, 1969, the plaintiffs, Peggy Givens, age eleven, and Rose Mary Givens, age thirteen, got into a dispute with Peggy's teacher, Mrs. Charlotte S. Rhoden, at Double Oaks Elementary School in Charlotte. The children were sent home immediately; a conference was held next day; they were formally notified of their exclusion a month later.

The children then brought this suit under 28 United States Code, § 1343(3)

## FINDINGS OF FACT

A. *The Nature of the Dispute between the Givens Children and the Teacher.*—Peggy Givens and Rose Mary Givens are two of the six children of 37-year-old Maggie Givens, who has a fifth grade education, had her first child at age 16, is black, unemployed and separated from her husband. They had previously been involved in fights at school; school personnel considered the family to be hostile and combative. The documentary evidence submitted to support the exclusions recited among other things poor attendance and cooperation problems with the *family* dating back to 1955, before Rose Mary and Peggy Givens

were born. The official version of the fight was that on December 12, 1969, Peggy Givens got into a dispute with a classmate, left the room without permission, went and got her older sister, Rose Mary, from a sixth grade classroom, returned and resumed the dispute; the teacher intervened and was attacked by the girls. The contention of the plaintiffs is that the teacher accused Peggy unjustly, based on what someone else had said, and that Rose Mary, upon being called by Peggy, went to find out what was happening to her sister and was, herself, attacked.

The court took no testimony to determine the merits of the fight itself and makes no finding on that issue; this statement as to the nature of the dispute is relevant only because it shows that there were serious factual issues that some finder of fact needed to resolve fairly before deciding whether any punishment or discipline was in order.

B. *How the Givens Children were Eliminated from School in 1969.*—After the disturbance on December 12 the children were ordered home and told to come back with their parents next day. They were not told there would be a hearing. The mother, being sick and unable to come, sent her older daughter (age 22, an eighth grade dropout) to the principal's office with Peggy and Rose Mary. She was not told the children had been "excluded." No hearing was conducted; no effort was made to develop the children's version of the incident. There was no fact finding inquiry and no record was made. The purpose of the meeting was apparently to tell the family representative *why* the girls *had been* "suspended" from school.

Follow-up procedures included a December 19, 1969 letter from the school principal to the school superintendent requesting that the children be excluded from school; some staff investigation; and on January 13, 1970, a month after the children's education had been terminated, a letter from the school superintendent notifying the mother that the children would not be allowed to attend the public schools. Nothing was said in the letter about a hearing or a right to a hearing.

Plaintiffs filed this suit and four weeks later, on February 23, 1970, the superintendent wrote the plaintiffs' attorney summarizing the charges and, for the first time, offering to have a hearing upon demand.

Later some psychological tests were made. Plaintiffs received tutoring by the wife of one of their lawyers, and in October, 1970, they were admitted to a special education program at a local school.

C. *How Alfred Belk was Eliminated from Olympic High School in November, 1971.*—Alfred Belk is sixteen, black, a singer with a band, and a member of the Executive Council at Olympic High School. A teacher suggested that he and several other students meet and try to explore the reasons for recent student unrest. There was some disorder among students on November 2, 1971, and police came and arrested some students. [He took no part in the student disorder, he said.] Next day he went and complained to the principal that all the students arrested had been black, and that whites had not been subjected to the same disciplinary standards. While at the principal's office a white man came and identified him, saying "That's the boy"; he was arrested by a plain clothes policeman and taken away. Next day, November 4th, his mother received a letter from the school principal advising of his summary exclusion from school. His attorney called to inquire and was told by the principal there was no use in trying to get Belk back into school. The principal's letter said nothing about an opportunity for a hearing or even a curiosity on the part of the principal to seek the facts about Belk's "guilt" or innocence. No hearing had been offered Belk at the time of the trial of this case on November 22–23, 1971. [Counsel for defendants subsequently advised the court that the defendants had confessed error in the procedure by which Belk had

been excluded, and had allowed Belk to return to school.]

D. *Suspension and Exclusion Procedures as Described by School Officials at the November 22-23 Trial.*—At the trial on November 22–23, 1971, school officials identified, as the only then existing written procedures for suspension and exclusion of pupils, a communication which had been promulgated to school people by the superintendent in 1964 and re-published in 1966 without material change under the title "Proposed Structures" (Exhibit 1 to this decision).

From the "Proposed Structures" and from testimony of the superintendent and assistant superintendent, the court finds that: (1) The school board itself had never adopted any required procedures for disciplinary hearings; (2) A child or parent had no right to a hearing *before* suspension, although the superintendent testified that it "would be good practice" to have a confrontation between child and teacher in cases like this one; (3) Suspension was often used as a lever to get the attention of parents to come in for a conference; (4) After a child *had been* suspended for bad conduct, the principal was expected to notify the parents to come in for a "conference" (*not a hearing*); (5) At this conference the principal explained why the pupil *had been* suspended; (6) There was no right at this "conference" to have a written statement of the charges, to testify or produce evidence, to confront accusing witnesses, to be represented by counsel or otherwise, or to be heard on the merits of the charges; (7) The child could not return to school pending investigation of the facts or pending appeal from the suspension; (8) If the principal intended to recommend that the child be excluded from the school, the child was kept out of school pending an *ex parte* investigation and "documentation," followed by formal notice of exclusion from the superintendent to the parents if the principal's recommendation was followed; (9) In the entire history of the school system up to the time of the trial only four children had ever made it

through to a formal appeal to and hearing before the school board under North Carolina General Statutes, § 115–34; these hearings were all in 1971; the hearings were not held until intervals of *25 to 43 days after* the original suspensions.

Under the above practice suspensions and exclusions had been effected from 1968 until November, 1971, as follows:

| EXCLUSIONS | | SUSPENSIONS | |
|---|---|---|---|
| 1968–69 | 37 | 1968–69 | 1,541 |
| 1969–70 | 24 | 1969–70 | 3,224 |
| 1970–71 | 32 | 1970–71 | 6,568 |
| 1971–72 | 48 | 1971–72 | 1,098 |

Suspension without hearing has been the disciplinary weapon of choice. Most of the suspensions have been for three days or less. [For example, of the 6,568 suspensions in 1970–71, it was estimated that more than 4,000 were for periods of one to three days.] However, 12% of the suspensions (this would be about 800) in 1970–71 were for five days or more. The student population of the schools is over 80,000. In 1970–71, some 28 out of the 32 *excluded* from school were black males.

From the Belk case and from the foregoing information it was apparent that the class of students subject to suspension or exclusion without prior hearing is county-wide, and that in the two years from the Givens suspensions in 1969 to the time of the November, 1971 hearing, little, if any, action had been taken towards establishing standards of fair play ("due process") in disciplinary procedures.

E. *Procedures "Proposed" after the November 22-23, 1971 Trial.*—At the trial, when it became apparent that under existing practices and regulations there was no right to a due process hearing before prolonged suspension or exclusion, the court asked counsel for the defendants to determine whether defendants might undertake to provide such procedures for the future. Later, counsel for the defendants filed a four-page set of *"Proposed* Rules" for "Suspension and Exclusion from Attendance" (Exhibit 2, attached hereto).

If these proposed rules had been in effect when Belk and the Givens children were excluded, they would have met many of the minimum elements of due process.

However, there is no evidence whether these proposals have been adopted by the board; they appear to be proposals of the attorney (or perhaps the staff) to the board, not proposals of the board to the court, nor orders of the board to the staff; they were not in force when the Givens children were excluded in 1969, nor, obviously, when Belk was excluded in November, 1971, nor at the time of the trial; they are deficient in various ways, for example, they provide no right to confront accusers unless "essential to the investigation"; they are labeled as "Suspension Procedures" and "Exclusion Procedures" (i. e., how the principal should act when he thinks he's probably going to send a child home), rather than as "Hearing Procedures" or "Fact-Finding Procedures"; they treat the initial pre-suspension conference as part of an "investigation" rather than a due process hearing; they contain no requirement that suspension decisions be based on evidence; they leave open the option, labeled "Absence before Conference" to keep a student out of school for indefinite periods without a hearing or conference.

## LEGAL CONSIDERATIONS

*A. Background North Carolina Law*

*The Constitutional Right to Public Education.*—The North Carolina Constitution provides that "[t]he people have a right to the privilege of education . . ." (Article 1, § 15); that "[s]chools, libraries and the means of education shall forever be encouraged" (Article 9, § 1); that public schools shall "be maintained at least nine months in every year, and wherein equal opportunities shall be provided for all students" (Article 9, § 2); that "every child of appropriate age and of sufficient mental and physical ability shall attend the public schools, unless educated by other means" (Article 9, § 3); and that "the State Board of Education shall supervise and administer the free public school system" (Article 9, § 5).

*Statutory Authority for School Operation.*—The General Statutes of North Carolina provide for a general and uniform system of free public schools (G.S. § 115-1); the duty to provide such schools, and the control over them, is placed in local school boards (§§ 115-35, 45); school boards have power to hire and fire (§ 115-145) and control teachers, principals, and supervisors (§ 115-58); county superintendents have power to hire or approve the election of principals and teachers (§ 115-58); and to dismiss or fire them (§ 115-145); principals have authority to "exercise discipline over the pupils of the school" (§ 115-150); teachers have the duty "to maintain good order and discipline" (§ 115-146); and principals and teachers may use "reasonable force in the exercise of lawful authority to restrain or correct pupils and maintain order" (§ 115-146).

*Suspension or Dismissal of Pupils.*— G.S. § 115-147, at the time this suit was filed, provided

> *"Power to suspend or dismiss pupils.* —The principal of a school shall have authority to suspend or dismiss any pupil who wilfully and persistently violates the rules of the school or who may be guilty of immoral or disreputable conduct, or who may be a menace to the school: Provided, any suspension or dismissal in excess of ten school days and any suspension or dismissal denying a pupil the right to attend school during the last ten school days of the school year shall be subject to the approval of the county or city superintendent. Every suspension or dismissal for cause shall be reported at once to the superintendent and to the attendance counselor, who shall investigate the cause and deal with the offender in accordance with rules governing the attendance of children in school."

In 1971 a proviso was added to § 115-147 that

" . . . any student who is *suspended* or dismissed *more than once* during the same school term shall be subject to permanent dismissal for the remainder of the school term at the discretion of the principal, with the approval of the superintendent. In the absence of an abuse of discretion, the decision of the principal, with the approval of the superintendent, shall be final." (Emphasis added.)

*Appeals.*—G.S. § 115–34 and § 115–165 authorize appeals from decisions of school personnel to the board of education (which under a 1971 amendment may now hear such appeals in panels of two or more). However, appeals to the local Superior Court seem to be limited to board actions "affecting one's character or right to teach." Court review of suspensions and exclusions, regardless of where the child lives, would appear to be limited by G.S. § 115–165 to the Superior Court of *Wake* County under G.S. 143, Article 33, the Administrative Procedure Act. There is, moreover, on account of the wording of § 115–165, some question whether any court review at all is authorized of board orders suspending or excluding a child for *disciplinary* reasons.

B. *School Children Charged With Serious Disciplinary Offenses Are Entitled To Due Process of Law.*

■ It is required under the Constitution that the state's power over students in public schools be exercised with due process of law—that is, fairness.

Due process of law is not an American invention. It seems to have been a trademark of civilization for thousands of years. By the age of Pericles (5th Century B.C.), the concept of fair hearing seems to have been accepted; the chorus in Aristophanes' legal satire, *"The Wasps,"* chanted that

"T'was a very acute and intelligent man, whoever it was, that happened to say,

Don't make up your mind till you've heard both sides."

When the Apostle Paul was put on trial in the first century A.D. before Festus, that Roman governor refused to proceed against him without a hearing, reporting to King Agrippa that

"It was not the custom of the Romans to give up anyone before the accused met the accusers face to face and had opportunity to make his defense concerning the charge laid against him." New Testament, Acts of the Apostles, Chapter 25, Verse 16.

■ The Fourteenth Amendment to the United States Constitution, which applies to actions of state agencies such as school boards, provides that no person may be deprived of life, liberty, or property without "due process of law." Our definition of due process has been worked out by courts through the two centuries since the Republic was founded. There are some fuzzy edges in the definition, just as there are in many statements of public duty; and the strictness of due process requirements may be affected by the nature of the case; but the basic principles are clear. In the recent case of Groppi v. Leslie, 404 U.S. 496, 92 S.Ct. 582, 30 L.Ed.2d 632, decided January 13, 1972, Chief Justice Burger expressed it this way:

"Indeed, we have stated time and again that reasonable notice of a charge and an opportunity to be heard in defense before punishment is imposed are 'basic in our system of jurisprudence.' In re Oliver, 333 U.S. 257, 273, [68 S.Ct. 499, 507, 92 L.Ed. 682] (1948). See, e. g., Joint Anti-Facist Refugee Committee v. McGrath, 341 U.S. [123] 143, 164–165, 171–172, 178, 185, [71 S.Ct. 624, 633, 644–645, 648–649, 652, 655, 95 L.Ed. 817] (1951) (concurring opinions of Black, Frankfurter, Douglas, and Jackson, JJ.); Cole v. Arkansas, 333 U.S. 196, 201, [68 S.Ct. 514, 517, 92 L.Ed. 644] (1948). We have emphasized this fundamental principle where rights of less standing than personal liberty were at stake. E. g., Sniadach v. Family Finance Corp., 395 U.S. 337, [89 S.Ct. 1820, 23 L.Ed.2d 349] (1969); Morgan v. United States, 304 U.S. 1, 18 [58 S.Ct. 773, 776, 82 L.Ed. 1129]

(1938); Grannis v. Ordean, 234 U.S. 385, 394 [34 S.Ct. 779, 783, 58 L.Ed. 1363] (1914). In Mullane v. Central Hanover Trust Co., 339 U.S. 306 [70 S.Ct. 652, 94 L.Ed. 865] (1950), the Court stated:

> " 'Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.' 339 U.S., at 313, 70 S.Ct., at 656." Groppi v.

Leslie, *supra*, at 502–03, 92 S.Ct. 586, 30 L.Ed.2d 638.

■ Extended suspension or exclusion from school deprives a student of important rights and liberties. Exclusions for weeks and months without a hearing have been ordered in many cases. Such long-absences threaten the pupil with inability to keep up with his classes and with loss of his year's work and of his incentive to continue his educational career. The Constitution of North Carolina treats education as the right of every child of "sufficient physical and mental ability." The language and atmosphere of the latest "proposed" rules are almost criminal in their tenor. The proposals talk in terms of "offenses"; of "accusers" and "accusations"; of the "accused" and of "disciplinary" measures; and they speak of retention in school as "probation." Therefore, although of course more procedural leeway is allowable than if the child were being tried for a capital felony, the basic essentials of due process should be observed in consideration of charges which, if proved, could result in expulsion or prolonged suspension from school.

Numerous courts, including the Supreme Court of the United States, have addressed themselves to various phases of this problem.

> "It goes without saying, and needs no elaboration, that a record of expulsion from high school constitutes a lifetime stigma. It would seem that in taking an action of such drastic nature the Board of Education would have been interested in providing plaintiff with the opportunity to offer his explanation of the circumstances *prior* to the actual expulsion action by the Board." Vought v. Van Buren Public Schools, 306 F.Supp. 1388, 1393 (E.D.Mich. 1969).

"I find that to deny a 16 year old eleventh-grade male and a 17 year old twelfth-grade male access to a public high school in Wisconsin is to inflict upon each of them irreparable injury for which no remedy at law is adequate. I make this finding by taking judicial notice of the social, economic, and psychological value and importance today of receiving a public education through twelfth grade." Breen v. Kahl, 296 F.Supp. 702, 704 (W.D.Wis. 1969), affirmed, 419 F.2d 1034 (7th Cir., 1969), cert. denied, 398 U.S. 937, 90 S.Ct. 1836, 26 L.Ed.2d 268 (1970).

"But it must not be forgotten, however small the community, however familiar to one another the characters in the drama, that when a school board undertakes to expel a public school student, it is undertaking to apply the terrible organized force of the state, just as surely as it is applied by the police, the courts, the prison warden, or the militia." Breen v. Kahl, *supra*, 707.

"In our system, state-operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students. Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969).

"The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted. These have, of course,

important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." West Virginia State Board of Education v. Barnette, 319 U.S. 624, 637, 63 S.C. 1178, 1185, 87 L.Ed. 1628 (1943).

"We cannot, because of modest estimates of our competence in such specialities as public education, withhold the judgment that history authenticates as the function of this Court when liberty is infringed." *Barnette, supra,* 640, 63 S.Ct. 1186.

■ Not all school discipline due process cases have reached identical results. The Supreme Court has written no blueprint. However, where exclusion or suspension for any considerable period of time is a possible consequence of proceedings, modern courts have held that due process requires a number of procedural safeguards such as: (1) notice to parents and student in the form of a written and specific statement of the charges which, if proved, would justify the punishment sought; (2) a full hearing after adequate notice and (3) conducted by an impartial tribunal; (4) the right to examine exhibits and other evidence against the student; (5) the right to be represented by counsel (though not at public expense); (6) the right to confront and examine adverse witnesses; (7) the right to present evidence on behalf of the student; (8) the right to make a record of the proceedings; and (9) the requirement that the decision of the authorities be based upon substantial evidence. Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir., 1961), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961); Esteban v. Central Missouri State College, 277 F. Supp. 649 (W.D.Mo., 1967), affirmed, 415 F.2d 1077, Blackmun, J. (8th Cir.,

1969); Black Students v. Williams, 335 F.Supp. 820 (M.D.Fla., Ft. Myers Div., 1972); Breen v. Kahl, *supra*; Vought v. Van Buren Public Schools, *supra*. For additional citations of authority see R. Butler, "The Public High School Student's Constitutional Right to a Hearing," 5 CLEARINGHOUSE REVIEW 431 (1971) and W. Buss, "Procedural Due Process for School Discipline: Probing the Constitutional Outline," 119 Penn.L.Rev. 547 (1971).

Not all courts have expressly required all the items listed above, but all items do appear essential if both the substance and the appearance of fairness are to be preserved.

## CONCLUSIONS OF LAW

■ Peggy and Rose Mary Givens and Alfred Belk were excluded from school without due process of law. The exclusion of scores and the temporary suspension of apparently hundreds of other children have taken place without due process of law. As to the Givens children, their personal claim for reinstatement is moot; however, the question of equitable relief on behalf of others is still open and the adoption of clear constitutional procedures for the hearing of school discipline cases is obviously indicated.

## ORDER

It is not at all clear just what procedures are, in fact, being followed in the Charlotte-Mecklenburg schools today. The court is not aware whether the Board of Education has adopted any regulation requiring the observance of due process.

In the interval between the suspension of Belk on November 3, 1971, and the filing of the "proposed" rules on December 2, 1971, a great deal of progress seems to have been made in the thinking of some of the school people. It may be that there is no longer a serious issue between plaintiffs and defendants as to the ongoing procedures needed for the future; it may be that the purpose of the suit has already been achieved.

Since the record is incomplete the court requires more information before considering or making any specific orders as to discipline procedures.

Based upon the foregoing findings of fact, legal authorities and conclusions of law, it is therefore ordered, that defendants file by July 10, 1972, an affidavit containing:

(a) The full text of any resolution of the Board of Education subsequent to November 22, 1971, dealing with procedures for the conduct of hearings in school discipline cases;

(b) The full text of any directives which have been issued by or for the Board of Education or the Superintendent of Schools dealing with procedures in school discipline cases; and

(c) A statement of the manner in which any such resolutions or directives have been communicated and will from time to time be communicated to teachers, principals and other affected persons.

After receipt of this information, a determination will be made as to such further hearings and such further orders as may then be appropriate in view of the foregoing principles.

EXHIBIT 1

PROPOSED STRUCTURES

. . .

"III.   Suspensions and Exclusions.

A.   Procedure *for Suspending* Pupils

1.   Parents shall be notified in writing *when a pupil is suspended.* This notification shall set forth the number of days for which the pupil is suspended and the circumstances which *made* the suspension necessary.

2.   This notification should be prepared in triplicate. One copy should be sent to the parents, one to Office of the Superintendent of Schools, and one shall be filed in the pupil's cumulative folder.

B.   Procedure *for Excluding* Pupils.

1.   It is anticipated that most recommendations for exclusion will come

as a result of consultation with or re-referral to the school social worker. If the school social worker has not been involved in a case which has reached the point at which exclusion is being considered, the school social worker should be consulted.

2.   After adequate investigation, which may involve other Special Services and/or outside agents, the school social worker submits to the principal a recommendation regarding exclusion.

3.   The principal may recommend to the Superintendent of Schools, through the appropriate Assistant Superintendent, that the child be excluded. This recommendation must be accompanied by all pertinent documents.

4.   The Superintendent acts on this recommendation, and, *if exclusion* is to *be carried out,* sends written *notification of this action* to the parents, school, the School Social Work, and the Services Office. A conference with parents, principal and school social worker should *then* be held *to discuss the implications of the exclusion* and the parents' plans for the student.

5.   Within one year the case is automatically reopened for review by the School Social Work Services.

6.   Reopening of the case otherwise is the responsibility of the principal.

7.   Labor Bureau is notified of student's exclusion, if employment is recommended."

EXHIBIT 2

*Suspension and Exclusion from Attendance*

The Board of Education has established the fact that an educational opportunity is the right of every pupil and that the Charlotte-Mecklenburg Schools will seek to provide an atmosphere conducive to the orderly pursuit of this right. Therefore, principals shall attempt, through every reasonable means and by the use of every available resource, to foster the learning process for every pupil. They shall also seek to determine the causes for the special needs

of those pupils having academic or personal difficulty and take every reasonable measure to enable them to cope with or reduce this difficulty. When it becomes evident that all efforts have failed and that extreme measures must be taken, principals shall proceed within the philosophy that such measures are for the protection of the pupil or his peers or are to help him in dealing with his problem, not as a punishment for unacceptable actions. Due process will be observed in guarding the rights of the pupil and in advising him of these rights.

I.  Suspension procedures

A.  When suspension is being considered, the principal will follow the procedures outlined below:

1.  Investigate the incident and hear all available accounts, obtaining written accounts whenever possible from eyewitnesses.

2.  Give the pupil a written notice of the offense(s) of which he is accused.

3.  Summon the pupil and his parents or guardian to a conference immediately or at a mutually convenient time.

4.  Hold a conference with the pupil and his parents or guardian, giving them names of accusers and oral or written reports of accusations. If essential to the investigation, the pupil should be allowed to face his accusers.

5.  Allow the pupil to present his defense.

6.  Should the principal decide to suspend the pupil, he should announce this to the pupil and his parents or guardian and give them and the superintendent's office written notice of the terms of suspension (number of days, returning date, and reasons).[1]

B.  If the behavior precipitating possible suspension places the safety of school operations in jeopardy, the principal may send the accused pupil home until a conference can be held (See Step 3 above). The elapsed time shall be brief, limited to a few days. Sending a pupil home until such a conference can be held shall not be considered to be a suspension. The period shall be referred to as ABC (Absence Before Conference).

If a pupil is to be sent home during the day, these guidelines will prevail:

1.  The principal shall attempt to reach the pupil's parents or guardian to inform them of the school's action and to request that they come to school for their child.

2.  If they are unable to come for the child, the school shall try to provide transportation to his home, assuming his parents or guardian will be there to receive him.

3.  If the principal can not reach his parents or guardian, unless circumstances make it unfeasible, the pupil must remain at school under the principal's supervision until the close of the school day. The age of the pupil should be an important factor in making this decision.

II.  Exclusion procedures

A.  Steps 1–6 will be followed as outlined in the section on suspension above. The pupil and his parents or guardian will be informed that exclusion is under consideration. From this point there are two procedures that may lead to exclusion:

1.  The principal may exclude a pupil for cause if the pupil has been suspend two times during the current school term prior to the exclusion action.[2] This action must be approved by the superintendent, but the burden of justifying the action falls on the principal.

a.  Prepare documentation including:

(1)  A brief outline of the development of the problem.

(2)  A brief outline of the school's efforts to assist the pupil in coping

---

1.  See Policy 5114

2.  See G.S. § 115–147

with the problem (involvement of teachers, counselors, Learning Development Center personnel, outside agencies, etc.).

(3) The precipitating behavior or behaviors with dates of incidents and notation of suspension actions.

(4) Signed statements of staff in position to document disturbing behaviors, attest to helping efforts, describe precipitating incidents as eyewitnesses, or give progress reports on the pupil.

(5) A brief summary of the conference with the pupil, his parents or guardian, and his accusers.

b. Write a letter to the superintendent informing him of the exclusion, giving the reasons, outlining the appeal process, and requesting approval of this action. A copy of the letter shall be sent to the parents or guardian of the pupil.

c. Send letter and accompanying documentation to the office of the assistant superintendent for special education services.

The assistant superintendent for special educational services will evaluate the material to determine whether or not there has been abuse of discretion and recommend approval or disapproval to the superintendent. If he approves, the superintendent will notify the parents or guardian. However, should the superintendent disapprove, the principal shall write a letter to the pupil and his parents or guardian rescinding the exclusion action and readmitting the pupil to school. Such an event does not preclude the principal's use of other disciplinary measures open to him.

2. The principal may request the superintendent to take action excluding the pupil.

a. Prepare documentation as noted in section 1a. above.

b. Prepare a letter to the superintendent requesting him to exclude the pupil, noting the reasons for this request and including a brief description of precipitating incidents with dates.

c. Address the letter and documentation to the superintendent and send them to the assistant superintendent for special educational services.

The assistant superintendent for special education services will review the material and make a recommendation to the superintendent. If the superintendent approves of the request, he will send a letter to the parents or guardian excluding the pupil from the Charlotte-Mecklenburg Schools. If he disapproves of the request, he will send a letter to the principal noting the reasons for his disapproval. The principal should notify the parents or guardian that exclusion is no longer being considered and outline the terms of probation, if any, attached to the pupil's continued attendance at school. This action does not preclude the principal's use of other disciplinary measures open to him.

B. The Board of Education Policies and Behavior Guidelines indicate exclusion as the unnegotiable consequence of certain behaviors. When they apply, the following procedures will be used:

1. Follow Steps 1–6 as outlined in the section on suspension above.

2. Follow procedures for exclusion outlined in either A.1 or A.2 above.

III. In extreme cases when an uncontrollable and disruptive situation is imminent or present, appropriate law enforcement officers may take whatever action is necessary to restore order.[3] However, guidelines as outlined above are to be followed if suspension and/or exclusion become necessary.

Rules Proposed.

3. See Administrative Regulations 2460