David M. NASH and Donna C. Perry, Plaintiffs,

v.

AUBURN UNIVERSITY, Frank G. Vice, J.T. Vaughan, H.C. Morgan, and James E. Martin, Defendants.

Civ. A. No. 85–H–1141–E.

United States District Court, M.D. Alabama, E.D.

Oct. 23, 1985.

McPhillips, DeBardelaben & Hawthorne, Julian McPhillips, Griffin Sikes, Jr., Montgomery, Ala., for plaintiffs.

Balch & Bingham, David Boyd, Montgomery, Ala., Samford & Samford, Thomas D. Samford, III, Opelika, Ala., Melton & Espy, Joe Espy, Montgomery, Ala., for defendants.

## MEMORANDUM OPINION

HOBBS, Chief Judge.

This cause is now before the Court on defendants' motion for summary judgment filed October 15, 1985 and plaintiffs' motion for summary judgment filed on October 16, 1985. Counsel for both parties orally waived the Rule 56(c) ten day waiting period before the time fixed for a hearing, and a hearing on both motions was held on October 18, 1985. Upon considera-tion of the motions, briefs, affidavits, tran-scripts, oral arguments of counsel, and oth-er documents properly before this Court, the Court is of the opinion that plaintiffs' motion for summary judgment is due to be denied, and defendants' motion for summa-ry judgment is due to be granted.

## FACTS

Plaintiffs Nash and Perry were first year students in Auburn University's College of Veterinary Medicine at the time of the events which form the basis of their claims. On June 6, 1985, they were advised in writing that they were charged with viola-tions of the University's Student Code of Professional Ethics (the "Code"). The spe-cified violation was "academic dishonesty, in that while taking examinations during 1984–1985 school year, information was al-legedly obtained in an unethical manner." The notice advised that in accordance with the Code, plaintiffs were allowed 72 hours to prepare their defense and that a hearing would be conducted by the Student Board of Ethical Relations (the "Board") on June 10, 1985.

Plaintiffs attended the June 10 hearing accompanied by counsel. Before any evi-dentiary proceedings commenced, plaintiffs objected to the June 6, 1985 notice as inade-quate and too vague to reasonably advise them of the charges against them. Plain-tiffs requested a more specific notice, and one additional day to prepare their defense. After consultation with counsel, plaintiffs expressly agreed to a new hearing date on the evening of June 12, with the under-standing that a more specific charge would be made by 1:00 p.m. on June 11.

Plaintiffs timely received the restated no-tice which charged them with "giving or receiving assistance or communications ... during the anatomy examination on or about May 16, 1985" in violation of the Code. The notice also listed several class-mates of plaintiffs and several members of the anatomy faculty who were expected to support the charges at the hearing.

The student honor court hearing was conducted as scheduled on June 12. Again,

plaintiffs were accompanied by an attorney, who was allowed to counsel and advise plaintiffs during the hearing, but who was not allowed to participate directly in the proceedings. The Board did not have legal counsel present, and the proceedings were conducted by the non-voting student chancellor of the Board. The plaintiffs, witnesses and Board members were all present throughout the hearing. A transcript of these proceedings is an exhibit in this case, (Def.Exhibit # 20).

At the hearing before the student honor court, the witnesses against plaintiffs first made their statements and answered questions from the Board members. Plaintiffs were then allowed to present their own statements, respond to the charges, and rebut the statements of the witnesses. Next, plaintiffs presented witnesses in their defense who also gave statements and responded to the Board members' questions. Further questions were directed by the Board members to the witnesses and to the plaintiffs. After the Board completed its questioning, plaintiffs were provided an opportunity to question the witnesses against them by directing their questions through the chancellor. Although plaintiffs asked some questions of Board members, their request for a recess was denied and the hearing was concluded.

Following the hearing, the Board deliberated outside the presence of witnesses and plaintiffs and unanimously concluded that plaintiffs were guilty of the charge of academic dishonesty. Plaintiffs were notified of the Board's finding, the recommended penalty of suspension with an option to reapply for admission after one year, and their right under the Code to appeal to the dean of the College of Veterinary Medicine.

On June 13, 1985, plaintiffs perfected an appeal to the dean. Pursuant to the Code, the dean referred the case to the college's Faculty Committee on Admissions and Standards (the "Committee") for a recommendation.

On June 19, 1985, the nine faculty members on the Committee conducted a day-long meeting to consider the appeal. They were provided copies of the materials presented at the Board hearing and then listened to the entire tape recording of the June 12, 1985 hearing before the Board, which hearing had taken in excess of three hours. Plaintiffs then presented well-prepared oral and written statements in their defense. After these statements, the Committee retired to deliberate, at which time they voted unanimously to recommend to the dean that the Board's findings and recommendation of punishment be upheld. The dean accepted the recommendation and upheld the Board's action.

Later in the summer, plaintiffs were allowed to perfect an appeal to the president of the University. After reviewing the file, the president affirmed the actions of the Board, the Committee, and the dean.

## DISCUSSION

In this action brought pursuant to 42 U.S.C. § 1983, plaintiffs claim that their procedural and substantive due process rights under the United States Constitution were violated by the actions of Auburn University and the other named defendants. In addition, plaintiffs allege a pendent state law claim that plaintiffs' enrollment in and payment of tuition to Auburn University constituted a contract which Auburn University breached by wrongfully suspending plaintiffs.

### I. *Procedural Due Process*

■ Defendants do not dispute that plaintiffs have both a property interest and a liberty interest which are adversely affected by their suspension from Auburn University. Consequently, defendants properly conclude that their actions must have accorded plaintiffs the minimal requirements of due process. *See Goss v. Lopez,* 419 U.S. 565, 574, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975); *Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972); *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971).

Since due process applies, the more difficult question is what process was due plaintiffs. *Goss v. Lopez,* 419 U.S. 565, 577, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975). Turning to that question the Court notes that "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). In the context of student suspensions, the Supreme Court in *Goss v. Lopez,* supra, 419 U.S. at p. 578, 95 S.Ct. at 738, has given this clear admonition:

> "Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint.... By and large, public education in our Nation is committed to the control of state and local authorities."

■ The courts have established minimum guidelines as to how much process is due in the context of student suspensions. The Supreme Court has emphasized that "[a] school is an academic institution, not a courtroom or administrative hearing room." *Board of Curators v. Horowitz,* 435 U.S. 78, 88, 98 S.Ct. 948, 954, 55 L.Ed.2d 124 (1978). Although "a university cannot ignore its duty to treat its students fairly, neither is it required to transform its classrooms into courtrooms." *Jaksa v. Regents of Univ. of Michigan,* 597 F.Supp. 1245, 1250 (E.D.Mich.1984), citing *Jenkins v. Louisiana State Board of Education,* 506 F.2d 992, 1000 (5th Cir.1975). Furthermore, procedural due process in the context of a school disciplinary proceeding does not require all the trappings or procedural safeguards of a criminal trial because "[f]ormalizing hearing requirements would divert both resources and attention from the educational process." *Jaksa,* 597 F.Supp. at 1250.

■ What procedural due process does require is, at a minimum, that the "students facing suspension ... be given *some* kind of notice and afforded *some* kind of hearing." (emphasis in original) *Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975). However, the "timing and content of the notice and the nature of the hearing will depend on appropriate accomodation of the competing interests involved." *Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975). Consequently, due process is a flexible concept "call[ing] for such procedural protections as the situation demands." *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). With these broad, flexible general principles as guides, the court will consider plaintiffs' procedural due process challenges.

### A. *Right to Adequate Notice*

■ Plaintiffs claim that the amended, specific notice given on June 11 was inadequate because it was not received until thirty hours before the hearing on June 12.

Without suggesting that the notice in this case would otherwise have been so short as to violate the Constitution of the United States, the record is clear that plaintiffs fully agreed to the schedule which was followed. The conversation between the student chancellor of the Board and plaintiffs' counsel at the June 10 scheduled hearing is significant on this point:

> Chancellor: In view of the request by Mr. Meadows to have more of an opportunity and more time for consideration of specific charges and in view of the fact that specific charges were not stated in the letter and after review and counsel from Dr. Morgan and Dean Vaughan, it is ... uh ... or has been decided that at least 48 hours shall be enough time, and 48 hours, if the accused and attorney ... attorney ... feel that that's necessary. *I ask them now if 48 hours is sufficient time?*
>
> Plaintiffs Attorney: Uh ... Mr. Vice, let me just ask. Am I to understand that we're having 48 hours from tonight with specific charges?
>
> ... If so, when will those charges be forth coming?

Chancellor: ... the specific charges can be given to you tomorrow, June 11, 1985. The dean's office by 1:00. They will be in writing, typed form, and those will be the charges that you all will have to address. And the time for the hearing, if it's agreeable, and probably if not agreeable ... the best possible time that I think that the next hearing should take place would be June 12, 1985, 6:45; 7:00 Wednesday night. *Is that sufficient time?*

Plaintiffs Attorney: That's fine with me. Can I take just a moment more to ask them? (MEADOWS CONSULTED WITH NASH AND PERRY.)

Plaintiffs Attorney: We'll ... *that's fine with us. 48 hours from tonight, which will be Wednesday night, June 12, at 6:45, here. That's fine. We'll be here.*

Chancellor: Uh ... since the justices and accused are in agreement, are the witnesses also in agreement to that time? The nods are in agreement that Wednesday night will ... June 12, 1985, 7:00, in the Pathology Department. So, with that, we'll adjourn until Wednesday night, 7:00. (emphasis added)

In view of a schedule which had the agreement of all the witnesses, the members of the court, *the plaintiffs and their attorney*, it would be shocking for this Court to conclude that the proceedings were constitutionally flawed because plaintiffs had inadequate time to prepare. Moreover, at the June 12 hearing, neither the plaintiffs nor their lawyer even suggested that they had not had an adequate opportunity to prepare for the hearing. This contention apparently surfaced for the first time in this Court. Consequently, this Court will not find defendants guilty of a due process violation because the parties adhered to a schedule to which plaintiffs explicitly agreed. *See Yench v. Stockmar,* 483 F.2d 820, 823 (10th Cir.1973); *see also, e.g. Stewart v. Bailey,* 556 F.2d 281, 285–86 (5th Cir.1977) (constitutional right can be waived by knowing, express waiver).

Defendants have argued other reasons why the notice given to plaintiffs was adequate. However, the Court does not need to address those issues, for it determines that plaintiffs waived any right they may have had to additional time for preparation.

B. *Right to Notice of the Evidence*

■ Plaintiffs assert that a line of Fifth Circuit cases beginning with *Dixon v. Alabama State Board of Education,* 294 F.2d 150 (5th Cir.), *cert. denied,* 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961), establishes that a summary of the testimony of the witnesses should usually be provided to students facing disciplinary charges before their hearing. It is true that the new Fifth Circuit in dicta has given that interpretation of *Dixon* in *Keough v. Tate County Board of Education,* 748 F.2d 1077 (5th Cir.1984). However, the court in *Dixon* did not require or even suggest that such information be given to accused students before a hearing.

Accurately summarized, *Dixon* said that if the disciplining body does not conduct a traditional evidentiary hearing, but relies instead on less formal proceedings, certain minimum procedures must be furnished. Among these is that, at a minimum, the student must be advised of the names of the witnesses against him and the actual substance of their testimony. The accused student must then be allowed to respond and present his own defense. These *Dixon* standards say nothing about pre-hearing disclosure of witnesses and evidence. *Dixon* only requires that *in lieu of* a traditional hearing, students must be given this information. *Accord, Ferguson v. Thomas,* 430 F.2d 852, 856 (5th Cir.1970). Indeed, a requirement that students accused of cheating be given this pre-hearing information would afford them more rights than one accused of a crime is afforded in a criminal trial. It would be strange if the Constitution were construed to require a student honor court considering a charge of cheating to provide more procedural safeguards than are given to an accused in court whose life is at stake. Accordingly,

plaintiffs' right to pre-hearing notice of the evidence was not violated because no such right existed.

### C. *Right to Cross Examine*

■ Plaintiffs assert that procedural due process in the case of student disciplinary proceedings mandates the opportunity for the accused students to confront and cross-examine the witnesses against them. Certainly, the cross-examination of witnesses is an important notion in our traditional concept of justice and fair play. For example, in *Goldberg v. Kelley*, 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970), the United States Supreme Court stated:

> In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.

Accordingly, courts have found violations of procedural due process where no form of cross-examination was allowed. *See, e.g., Dillon v. Pulaski County Special School District*, 594 F.2d 699 (1970); *Givens v. Poe*, 346 F.Supp. 202 (W.D.N.C. 1972); *Fielder v. Board of Education of the School District of Winnebago*, 346 F.Supp. 722 (D.Neb.1972).

However, the Fifth Circuit in *Boykins v. Fairfield Board of Education*, 492 F.2d 697, 701 (1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1975) held that *Goldberg v. Kelley* did not alter or overrule the standards outlined in *Dixon v. Alabama State Board of Education*, 294 F.2d 150 (5th Cir.), *cert. denied*, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961) for providing procedural due process in a student disciplinary proceeding. The *Dixon* standards do not require the opportunity of cross-examination. The court in *Boykins* went on to hold that no right to cross-examination or confrontation of witnesses exists in a high school disciplinary action. *Boykins*, 492 F.2d at 701–02. *Accord, Winnick v. Manning*, 460 F.2d 545, 549 (2d Cir.1972); *Jaksa v. Regents of University of Michigan*, 597 F.Supp. 1245, 1252–53

(1984). Neither the Fifth Circuit, the Eleventh Circuit, nor the Supreme Court has expanded the rule in *Dixon* to require cross-examination and confrontation of witnesses in the context of school disciplinary proceedings; consequently, *Dixon* remains binding on this circuit.

Although this case concerns graduate students rather than high school students, and the punishment of plaintiffs, if sustained, may have a greater impact on their reputations and careers, this Court is nonetheless satisfied that plaintiffs were allowed as much as the Constitution requires. *Dixon* concerned college students and did not find that cross-examination was mandated by the Constitution. Although plaintiffs' status as students in a graduate professional school may guarantee them greater rights than the students in *Dixon* were allowed, plaintiffs did, in fact, receive stronger procedural safeguards. Plaintiffs were not allowed to directly confront the witnesses and cross-examine them in the traditional manner. However, they were allowed to hear the testimony against them and were given an opportunity to direct questions to the witnesses through the student chancellor of the Board. (Def.Ex. # 20, pp. 47, 67, 103, 110). This opportunity is more than the Constitution requires and was more than was accorded the students in *Dixon*. Thus, the Court finds that no constitutional right of cross-examination was denied in this case.

### D. *Right to an Impartial Tribunal*

Plaintiffs allege that three circumstances prevented them from having the charge against them and their defenses heard by an impartial tribunal. The Court will address these three allegations individually.

#### (1) *Atmosphere of Bias and Prejudice*

■ Plaintiffs assert that a contemporaneous controversy involving a breach of the honor code at Auburn University resulted in such an atmosphere of bias and prejudice against any student accused of cheating that a fair hearing was not possible. In May, 1985 an undergraduate stu-

dent at Auburn University was caught with a crib sheet during an examination, confessed to cheating, and was suspended from school by an honor court. President Martin of the university reduced the sanction against the student and was publicly criticized by the Auburn Chapter of the Association of University Professors and the Auburn University student senate, and the chairman and seven members of the Auburn University Honor Committee resigned in protest.

Defendants do not dispute that this prior episode was "an emotionally charged one." (Plaintiffs Ex. # 16, p. 54) However, defendants assert, and the Court agrees, that plaintiffs have produced no evidence to raise a material issue of fact whether the proceedings were influenced or prejudiced in any way by the prior controversy. The deposition excerpts relied upon by plaintiffs, when read in context, demonstrate no more than the obvious—that a controversy did exist and that it was on the minds of many of the students and faculty. Plaintiffs, however, have pointed to no statements or other evidence that raise any inference that their rights were substantially prejudiced by the controversy and publicity surrounding the other incident. *See, e.g., U.S. Pipe & Foundry v. Webb*, 595 F.2d 264, 274–78 (1979). Few cases of public interest would ever be tried if public controversy by itself constituted a denial of due process.

### (2) *Irrelevant and Prejudicial Testimony*

Plaintiffs next contend that they were denied an impartial tribunal because of the presentation to the Board of "clearly irrelevant and highly prejudicial testimony." Specifically, plaintiffs complain that "[t]he whole of the testimonies of the student witnesses (transcript pp. 13–20) and most of the testimony of the teacher witnesses concerned observations of plaintiffs' activities on dates *other than May 16*, the date of the anatomy exam they were charged with cheating on." Plaintiffs' brief at 15.

However, all evidence if it has any probative value whatsoever is prejudicial to the opponent. Even under the Federal Rules of Evidence, prejudicial testimony is disallowed only if the prejudice *substantially* outweighs its probative value. FRE 403.

■ Moreover, it is settled that because classrooms are not courtrooms, student disciplinary proceedings do not need to conform to the formal procedures and rules of evidence which govern court trials. *See Boykins v. Fairfield Board of Education*, 492 F.2d 697, 701 (5th Cir.1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1975); *Morale v. Grigel*, 422 F.Supp. 988, 1004 (D.N.H.1976). Indeed, the Fifth Circuit has expressly "decline[d] to place upon a board of laymen the duty of observing and applying the common-law rules of evidence." *Boykins*, 492 F.2d 697, 701 (5th Cir.1974) (allowing hearsay testimony).

■ In any event, the Court is of the opinion that this testimony would have been admissible even under the Federal Rules of Evidence. Although character evidence of a person's prior "bad acts" is not admissible to show that the person acted in conformity therewith on a later occasion, Rule 404(b) of the Federal Rules of Evidence allows such evidence to show, among other things, "proof of motive, opportunity, interest, preparation, plan, knowledge, identity, or absence of mistake or accident." In the state courts, the same evidence falls under the admissible category of "common scheme or plan." Certainly, the testimony concerning prior episodes of looking at each others' papers, signalling to each other during lab exams, sitting out of assigned seats in the rear of the room during a test, and ignoring prior warnings about such actions would be admissible under Rule 404(b) at least under the categories of opportunity, intent, preparation, plan, and absence of mistake. Accordingly, because such testimony would be admissible in formal courtroom proceedings, it certainly would be admissible in a less formal student disciplinary hearing.

### (3) *Honor Court Justice with Prior Knowledge*

██ Finally, plaintiffs allege they were denied an impartial hearing because one of the student justices on the Board had prior knowledge of the May 16 incident but failed to recuse himself. The Court notes, however, that the law in this circuit and elsewhere is settled that previous contact with the incident and even with the initial investigation does not automatically disqualify one from hearing and deciding a case in a college disciplinary proceeding. *See, e.g., Duke v. North Texas State University,* 469 F.2d 829, 833–34 (5th Cir.1972), *cert. denied,* 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973); *Jenkins v. Louisiana State Board of Education,* 506 F.2d 992, 1003 (5th Cir.1973); *see also, e.g., Wimmick v. Manning,* 460 F.2d 545, 548 (2d Cir.1973); *Robison v. Wichita Falls & North Texas Community Action Corp.,* 507 F.2d 245, 253 (5th Cir.1975); *Stretten v. Wadsworth Veterans Hospital,* 537 F.2d 361, 369 n. 18 (9th Cir.1976).

██ As defendants have argued, the rationale of this rule is that student honor court proceedings could not be effective if *any* prior knowledge of the incident disqualified the decisionmaker. The College of Veterinary Medicine is a relatively-closed community in which honor court justices cannot remain entirely isolated from the facts and events of everyday student life. The deposition of the student justice who had "prior knowledge" demonstrates that his knowledge was only general in nature (Plaintiffs' Ex. # 6, pp. 10–11, 17–18) and that in fact, he had no prior knowledge of any violations occurring on the May 16 exam. (Plaintiffs' Ex. # 6, p. 26). His pre-hearing contact with the witnesses was only as a procedural matter to inform them pursuant to Section II, Part C of the Code that if they knew of any violations of the Code, the proper way to report them was to the non-voting chancellor. Accord-

ingly, the Court finds that plaintiffs were not denied an impartial tribunal.

### E. *Denial of a Meaningful Appeal*

██ Plaintiffs further assert that they were denied a constitutional right to a meaningful appeal. It is alleged that even though plaintiffs were allowed to appeal the Board's determination first to the dean and then to the president of the university, those appeals nonetheless denied plaintiffs due process because neither the dean nor the president actually heard the tapes of the proceedings before the student Board and the faculty Committee, nor did they prepare and read transcripts of the proceedings. However, "[t]he Supreme Court has never found a right to appeal as inherent in the right to due process of law." Nowak, Rotunda, & Young, *Constitutional Law* 499 (1978). All that due process requires is notice and an opportunity for hearing. *Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975); *Dixon v. Alabama State Board of Education,* 294 F.2d 150, 158–59 (5th Cir.), *cert. denied,* 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961). Accordingly, this Court cannot find a violation of a nonexistent right.[1]

### F. *Right to Counsel*

██ Plaintiffs allege that although they were allowed to have counsel present during the June 12 hearing, their constitutional right to counsel was denied because their attorney was allowed only to advise plaintiffs and was not permitted to actively participate in the proceedings. However, the great majority of cases support the conclusion that students facing disciplinary charges have no absolute right to have an attorney present their case. *E.g., Henson v. Honor Committee of University of Virginia,* 719 F.2d 69, 74 (4th Cir.1983); *Gabrilowitz v. Newman,* 582 F.2d 100, 104 (1st Cir.1978); *Wasson v. Trowbridge,* 382 F.2d 807 (2d Cir.1967); *Garshman v. Penn-*

---

1. Moreover, in this case the accused students were given a full hearing before nine faculty members who heard all the evidence before the student board and also the oral presentations of the accused.

*sylvania State University*, 395 F.Supp. 912, 920–21 (M.D.Pa.1975); *Haynes v. Dallas County Junior College District*, 386 F.Supp. 208 (N.D.Texas 1974); *Barker v. Hardway*, 283 F.Supp. 228 (S.D.W.Va.), *cert. denied*, 394 U.S. 905, 89 S.Ct. 1009, 22 L.Ed.2d 217 (1969); *Due v. Florida A & M University*, 233 F.Supp. 396 (N.D.Fla. 1963). *But see Mills v. Board of Education of District of Columbia*, 348 F.Supp. 866, 881 (D.D.C.1972); *Givens v. Poe*, 346 F.Supp. 202, 209 (W.D.N.C.1972).

■ The First Circuit in *Gabrilowitz, supra,* did allow a student to have counsel present, but only in an advisory capacity to lessen the risk of self-incrimination, because a separate criminal action was pending. Such extreme circumstances do not exist in this case; consequently, the right of plaintiffs to have counsel present at the June 12 hearing afforded them more, not less, than the Constitution requires.

### G. *Conclusion as to Procedural Due Process Challenge*

■ Plaintiffs have named several procedural rights they allege were denied by defendants in dismissing them from school. The Court has addressed each asserted violation of due process and concluded either that the Constitution guarantees no such right or that the right was not violated. However, plaintiffs insist that although each alleged violation may not by itself have constituted a denial of due process, their combined effect was such a denial. The Court cannot agree. Plaintiffs acquiesced in the notice given to them, and Auburn University provided them more than the Constitution requires when it allowed extensive appeals, the right to have legal counsel present, and the opportunity for indirect cross-examination. Plaintiffs' allegation that they were not tried by an impartial tribunal is meritless.

Moreover, plaintiffs did not demonstrate substantial prejudice as a result of any of the alleged denials of due process. *See U.S. Pipe & Foundry v. Webb*, 595 F.2d 264, 274 (5th Cir.1979). At both the June 12 and the June 19 hearings, plaintiffs

presented thoughtful, well-prepared defenses, and it is doubtful that their evidence could have been presented any more convincingly in a court of law. Although the procedure afforded plaintiffs was not a model for judicial proceedings, the Court finds that the minimal requirements of procedural due process were satisfied. Accordingly, defendants' motion for summary judgment on the issue of procedural due process is due to be granted and plaintiffs' motion for summary judgment on this issue is due to be denied.

### II. *Substantive Due Process*

■ Plaintiffs allege that the Board's finding of guilt violated plaintiffs' right to substantive due process because the finding was arbitrary and capricious and not supported by substantial evidence. In addressing this issue, the Court is governed by a limited standard of review:

> It is not the role of federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion.... [Section] 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings....

*Wood v. Strickland*, 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L.Ed.2d 214 (1975). This Court may not retry plaintiffs' case. Its role is only to determine whether enough evidence against plaintiffs was presented to the Board to foreclose a determination that the Board's decision was arbitrary and capricious. The parties disagree over whether the Court must find "substantial evidence" or only "some evidence" in support of the Board's conclusion. The Court does not need to reach that issue, however, because it finds substantial evidence to support the Board's determination.

■ Plaintiffs first assert that the evidence was insufficient because none of the student witnesses' testimony addressed the May 16 examination. Plaintiffs' assertion, however, is incorrect. One student testified at the June 12 hearing that he was

surprised to see David Nash sitting not in his normal seat but next to Donna Perry on the May 16 examination. This student sat directly behind the plaintiffs on this examination and "witnessed the accused looking *on each others'* papers." (emphasis added) (Def.Ex. # 20, pp. 18–19) (Plaintiffs' Exhibit 8, pp. 7, 9, 11–12). Another student testified that during the May 16 examination he saw Donna Perry when she had finished a page holding it up as in review. David was on the same page and his suspicions were aroused. (Def.Ex. # 20, pp. 19, 20). As the Court has previously discussed, the witnesses' testimony of suspicious activity by plaintiffs on occasions prior to the May 16 examination was properly before the Board.

Second, plaintiffs claim that even the witnesses who testified to seeing Nash look at Perry's paper could not testify that he actually took information from her examination. Of course these witnesses could not testify to the intentions and thoughts of plaintiffs, but such unattainable evidence is not required.

Finally, plaintiffs argue that Dr. Buxton's comparison and analysis of plaintiffs' answers on the May 16 examination should not have been given significant weight by the Board. Dr. Buxton prepared the May 16 examination and testified that from his observations of the accused and his study of their answers, he became convinced that they were engaging in academic dishonesty. (Def.Ex. # 20, p. 40). Dr. Buxton testified extensively at the June 12 hearing about the similarity of plaintiffs' answers. Dr. Rumph, another professor in the Department of Anatomy and Histology, also concluded from his observation of the accused and his independent study of their examination answers that they had given or received assistance one from the other. (Def.Ex. # 20, p. 41).

Plaintiffs argue that Dr. Buxton's analysis of plaintiffs' examination papers is patently flawed and unreliable. Plaintiffs state that of the twenty-eight questions, Dr. Buxton found the answers to only six were indicative to him of cheating.

At the October 18 hearing before this Court on plaintiffs' and defendants' motions for summary judgment, Dr. Harlley McKean, a professor in the statistics department of the University of Kentucky, testified that he had studied and compared plaintiffs' exams, and in light of the fact that plaintiffs studied together from the same notes, in his opinion the similarity of so few of plaintiffs' answers should not give rise to a conclusion of cheating. Dr. McKean conceded that he had no knowledge of veterinary medicine or neuroanatomy.

Although Dr. McKean's expert testimony and the testimony of the accused as to how they studied together provided possible explanation for the similarity of their answers, the Court determines that regardless of the weight given Dr. Buxton's analysis, there was substantial evidence to support the Board's conclusion. At the May 12 hearing, five student witnesses and several professors testified that on many previous occasions they had seen plaintiffs look on each other's papers, and exchange glances while examining tissue specimens together during lab examinations. Two professors on two separate occasions warned David Nash about this suspicious behavior. Dr. Cartee said he advised Nash that his sitting next to Donna Perry and moving together on tests could be conceived as dishonesty and he suggested "in their own best interest . . . that they should separate during exams." (Def.Ex. # 20, p. 44). Dr. Buxton was the other professor who gave Nash a warning about what appeared suspicious conduct between him and Perry. For a while after these warnings, plaintiffs took their examinations in different areas of the room. However, at the May 16 examination, plaintiffs once again chose to sit close together during the neuroanatomy examination.

Dr. Marshall, a professor monitoring the May 16 examination, noted the close contact of plaintiffs, (Def.Ex. # 20, p. 45), and stated that he saw Nash leaning his head on his hand in such a way as to see Perry's paper. (Def.Ex. # 20, p. 69). Dr. Garrett,

another professor in the school of Veterinary Medicine, also monitored the May 16 examination and testified that he "observed David, many times, sitting with his elbow on the table, his head propped in his hand, and his gaze directly at Donna's paper." (Def.Ex. # 20, p. 46).

It is also significant that the student Board, all of whom had previously taken this neuroanatomy course and who were familiar with the subject matter and testing procedures, and who observed the accused students as they gave their testimony, unanimously voted to discipline plaintiffs. After a *de novo* review, the nine person faculty Committee also voted unanimously to uphold the Board's decision. It is also significant that five professors and seven students independently had filed letters with the chancellor accusing plaintiffs of cheating throughout the semester. The fact that plaintiffs ignored two previous warnings and sat so close together during the May 16 examination when viewed together with this direct evidence of cheating and the evidence of plaintiffs' conduct during prior lab examinations constitutes further evidence in support of the Board's finding.[2] The decision of the student board and the review by the Auburn University Faculty Review Committee, the Dean of the Veterinary School and the President of Auburn University, can not be regarded as capricious or arbitrary. There is substantial evidence of academic dishonesty on the May 16 examination. Accordingly, plaintiffs have demonstrated no violation of their constitutional rights under the 14th Amendment.

### III. *Breach of Contract*

Plaintiffs also argue that their suspension constitutes a breach of contract. Regardless of whether defendants' payment of tuition to the University created an enforceable contract, Auburn University did not breach any contractual duty owed to plaintiffs by disciplining them for violat-

ing the student honor code which they expressly agreed and pledged to uphold. (Def.Ex. # 1–3). The Court has determined that plaintiffs' constitutional rights were not violated; consequently, plaintiffs' suspension was not wrongful.

### CONCLUSION

Because plaintiffs have demonstrated no denial of due process and no breach of either an express or an implied contract, defendants' motion for summary judgment is due to be granted, and plaintiffs' motion for summary judgment is due to be denied.

A separate judgment will be entered in accordance with this memorandum opinion.

---

**2.** Donna Perry acknowledged that she knew David Nash had been previously warned that their conduct on exams could be regarded as

suspicious conduct in violation of the student honor code. (Def.Ex. # 20, p. 79).